Charles Margett, J.
Action to restrain the defendants from consummating their asserted intention to satisfy and discharge of record a certain purchase-money mortgage, dated September 19, 1960 on real property, consisting of land and buildings of a proprietary hospital located in Jamaica, Queens County, New York.
This action was originally commenced on or about July 31, 1963 by the plaintiff Otto Gitlin, H.D., as owner of the mortgage above referred to, against the five individual defendants, who are the owners in common of the premises covered by the mortgage, and the defendant Theodore Korotkin, who is the person in physical possession of the mortgage, the mortgage note and related documents, as the escrowee thereof pursuant to an agreement dated September 19,1960, to which more detailed reference will be made. The owning defendants interposed an answer to Dr. Gitlin’s complaint but the escrowee defaulted.
Upon the stipulation dated October 25, 1963, signed by the attorneys for all appearing parties in the original action, an *232 order dated November 12, 1963 was made permitting Central Queens Realty Corporation, which claims an interest in the subject mortgage, to intervene in the action as a party plaintiff solely for the purpose of seeking a determination ‘1 of the issues of whether the named defendants, or any of them, are entitled to discharge, satisfy and cancel the mortgage here involved, without, however, in any way conceding that Central * * * is the true owner of the mortgage, or of any interest therein, and without prejudice to any other pending or future action with respect thereto ”, The foregoing order also provides “ that the issues of whether otto gitlin or central queens realty corp. is the present true owner of the mortgage herein involved, and what rights and obligations exist between otto gitlin and central queens realty corp. with respect to said mortgage, or any other matter, will not be tried or determined in the instant action ’ ’.
By an agreement dated July 8, 1960 entered into by Dr. Gitlin and Louis Holding Company, Inc., as “ Seller ” and Eastford Investors, Inc., as purchaser, the property, which hereafter will be called the “ hospital ”, was conveyed to Eastford by a deed dated September 19, I960. The purchase price was $1,800,000. The sum of $300,000 was paid in cash. There were first mortgages aggregating $248,000 and the balance of the purchase price in the sum of $1,252,000 was evidenced by a mortgage note dated September 19,1960( executed by Eastford, which was secured by the purchase-money mortgage here involved. Pursuant to an agreement between Eastford as mortgagor, Dr. Gitlin as mortgagee and Theodore Korotkin, Eastford’s president and attorney, as escrowee, likewise dated September 19, 1960, the $1,252,000 purchase-money mortgage, the mortgage note and certain allied documents were delivered in escrow to Mr. Korotkin as such escrowee and the mortgage was assigned to Mr. Korotkin by an instrument dated September 19, 1960 and duly recorded in the office of the City Register, Queens County.
At the closing on September 19, 1960, at which the foregoing instruments were executed and delivered, there was a leaseback of the hospital from Eastford to Dr. Gitlin for a term of 21 years at an annual rental of $221,000 ($18,416.66 per month). Taxes and certain other charges were payable by the tenant as additional rent. At the ¡same closing Eastford conveyed the property to the five owning defendants.
Dr. Gitlin operated the hospital until about April, 1961. He then assigned the lease to a Dr. Weissman, who in October, 1962 assigned the lease to a Dr. Power. The latter reassigned it on February 2, 1963 to Dr. Gitlin.
*233 The escrow agreement dated September 19, I960 recites (1) that the mortgagee (Dr. G-itlin) has this day sold to the mortgagor (Eastford) the hospital premises and as part of the purchase price the mortgagor has executed a note and purchase-money mortgage in the amount of $1,252,000; and (2) that simultaneously with such sale the mortgagor has leased to the mortgagee said premises by a certain lease agreement dated this day and that it is the intention of the parties that said purchase-money note and mortgage ‘ ‘ be further security for the full and faithful performance by the Mortgagee or his assigns and lessees of the said premises of all of the terms, covenants and conditions of said Lease in the manner and for the period of time hereinafter set forth.”
Paragraph “ 3 ” of the aforesaid escrow agreement provides: “In the event there shall be a default in the performance of any of the terms, covenants or conditions of the Lease as provided for in the Lease (the leaseback to Dr. G-itlin, Exh. 3), and if, after the then Landlord of the premises shall have given the notices required to be given pursuant to said Lease and said default shall continue, the Mortgagee shall have a period of Four (4) months within which to cure such default or defaults, which said period of four (4) months shall commence five (5) days after mailing notice by Registered Mail to Mortgagee and his authorized agent that a default exists, the nature thereof and what it is claimed is required to cure such default. ’ ’
Under paragraph “ 10 ” of the foregoing escrow agreement it is provided: “ In the event the Mortgagee shall fail to cure the default within the four-month period as aforesaid, Landlord shall have the right to demand from the Escrowee the delivery to it of the following documents: (a) the original Note; (b) the original Mortgage; (c) the original assignment to the Escrowee named herein; (d) mesne assignments to substituted escrow agents, if any; (e) the original reassignment and (f) an executed acknowledged assignment to Landlord or its nominee. Such demand shall be upon seven (7) days’ notice from day of mailing, in writing by registered mail, sent to the Escrowee, copies of which shall be sent simultaneously to the Mortgagee and his designated agent. Upon the expiration of such seven-day period, the Escrowee is directed to turn over such papers as aforesaid to the then-Landlord and upon such turning over the reassignment provided for herein shall be deemed a nullity and of no force and effect, and the Escrowee shall be relieved of his escrow hereunder, and the then-Landlord may discharge and satisfy the Mortgage of record.”
*234 In paragraph “ 13(b) ” of the escrow agreement it is provided as follows: “ In the event of a sale of the premises or in the event any one other than the Landlord herein names [sic] shall occupy the position of Landlord as defined by Article 36 of the Lease, such new Landlord shall, by a properly executed and acknowledged document delivered to the Mortgagee, agree to be bound by the terms and conditions of this agreement. Any Landlord as defined by Article 36 of the Lease must agree to be bound by the terms and conditions of this agreement in order to avail himself of the benefits to Landlord herein provided.”
There is no question that at the closing on September 19, 1960 Dr. Gitlin had knowledge of Eastford’s conveyance of the property to the five defendant owners and that he thereafter dealt with them as his lándlord. He paid the first month’s rent of $18,416.66 to them as well as the deposit of $22,500 required by paragraph “ 8 ” of the escrow agreement. All subsequent rent payments by Dr. Gitlin and/or his assignees or his sub-lessees were likewise made to these defendants and they, in turn, made all payments due Dr. Gitlin under the purchase-money mortgage in the sum of $8,333.33 a month. The contract for Dr. Gitlin’s sale !of the hospital to Eastford and the purchase-money mortgage were executed by Eastford for the purpose of avoiding personal liability thereon on the part of the five owning defendants and the documents marked Exhibits “2” through “9” were executed simultaneously at the closing on September 19, 1960 and a copy of the deed from Eastford to these defendants was delivered to Dr. Gitlin at such closing. No rent was paid since February 25, 1963, the day of the first default in that respect — a sum amounting to $205,706.66 as of December 5, 1963, the date of the stipulation signed by the attorneys for the respective parties other than those representing the intervenor. Had the rent under the leaseback to Dr. Gitlin been paid, the sum of $83,333.33 would have been paid on the mortgage note since March 1, 1963, thus reducing by that amount the present unpaid balance thereon of $1,065,331.88.
The hospital’s license expired on March 4, 1963. It has not been renewed. The hospital has been vacant and unused for any purpose whatsoever since it was closed on March 12, 1963. The five owning defendants are in possession of this closed hospital, having obtained a warrant of dispossess by default in a Civil Court proceeding commenced on or about July 27, 1963 by the service of a precept and petition but withdrew their demand for judgment in the sum of $123,423.96 for rent and additional rent from February 25 to August 24, 1963.
*235 There can be no question that prior to the trial the owning defendants never delivered to either plaintiff the duly executed and acknowledged document contemplated by paragraph “13(b) ” of the escrow agreement agreeing to be bound by the provisions thereof. They did execute such a document on November 1, 1963 but it was not delivered to either plaintiff but tendered to them at the close of the trial on December 11, 1963. This tender was declined as untimely and ineffective by the attorneys for both plaintiffs.
In the first cause of action plaintiffs seek relief against the cancellation of the mortgage upon the ground that the escrow agreement, insofar as it authorizes such cancellation, provides for an illegal forfeiture which is contrary to public policy and void. The second cause of action is based on the claim that the five defendant owners are not entitled to enforce the escrow agreement because they failed to deliver the assumption instrument required by paragraph “ 13(b) ” of that agreement in order to take advantage of the benefits thereof.
The defendants admit the execution of all the documents referred to in the complaint and that they demanded of the escrowee, Mr. Korotkin, that he turn over to them the mortgage, the mortgage note and the other documents involved and that Mr. Korotkin intends to comply with such demand and they, as the owners of the property, intend to discharge and satisfy the mortgage of record as soon as it is delivered to them. They deny, however, that the provisions in the escrow agreement relating to the cancellation of the mortgage in the event of a continuing default under the lease, work a forfeiture and contravene public policy. These provisions, they claim define the bargained-for consideration and express the true intention of the contracting parties, namely, that the mortgage is to have validity only so long as the lease is kept by the tenant-mortgagee, for paragraph “ 14 ” of the escrow agreement provides in pertinent part as follows: “ In the event of a default [under the lease] * * * and until such time as the default shall be cured, the payments required to be made by the owner of the premises to the Mortgagee herein under the terms of the Purchase Money Mortgage shall be suspended, provided, however, that upon the curing of the default and provided monthly payments required to be made * * * have been made and the security account restored as provided * * *, the owner of the premises shall make payment to the Mortgagee of all suspended payments of principal and interest required under the terms of the Mortgage and shall resume the regular monthly payments required under the Mortgage.”
*236 While admitting that paragraph “13(b)” of the escrow agreement provides that upon a sale of the property the ‘1 new landlord ” must deliver an instrument by which he agrees to be bound by the escrow agreement in order to be entitled to the benefits thereof, the defendants deny that they failed to deliver such an agreement and claim that they became owners of the property contemporaneously with its conveyance to Eastford, their grantor. By way of defense, they allege that Dr. Gritlin and they agreed that the assumption instrument required of a ‘ ‘ new landlord ’ ’ would not apply to them.
At best, argue the defendants, the mortgage and mortgage note represent only a synthetic obligation, without value absent an existing lease of the hospital premises, and that no payments are due under the mortgage by reason of the continued and uncured defaults; that the plaintiffs, having made no tender of performance at any time since the defaults began on or about February 2, 1963, are not entitled to the relief sought; indeed, they have refused the defendants’ offer to reinstate the lease, or in the alternative, to buy back the property at cost.
The facts and circumstances attending the transaction from its inception compel a finding that the parties at the closing on September 19, 1960 intended that the individual owning defendants have the benefit of the escrow agreement.
Realistically, these defendants were the only landlords to whom, from the beginning, the rent was paid under the leaseback to Dr. Gritlin and they, in turn, made the payments required by the purchase-money mortgage. It is they who negotiated with Dr. Gritlin before the execution of the original contract dated July 8, 1960 and Eastford, the purchaser under that contract, was in fact their nominee corporation, which they used for the purpose of avoiding personal liability on the mortgage note and the purchase-money mortgage. The closing documents were executed simultaneously and the first month’s rent and the deposit of $22,500 required by the escrow agreement were paid by Dr. Gritlin to the defendants. Indeed, he directed them, pursuant to the escrow agreement, as to what depository the security was to be placed. By all of the foregoing, the parties themselves have given the documents the practical construction that the owning defendants were not a ‘ ‘ new landlord ’ ’ within the contemplation of paragraph 13 (b) of the escrow agreement from whom a written assumption document would be required to avail themselves of the terms of the escrow agreement. As was observed in Insurance Co. v. Butcher (95 U. S. 269, 273): ‘ ‘ There is no surer way to find out what the parties meant, than to see what they have done. Self-interest stimulates the mind *237 to activity, and sharpens its perspicacity. Parties in such cases often claim more, but rarely less, than they are entitled to. The probabilities are largely in the direction of the former.” (See, also, Matter of Mencher [Getter & Sons], 276 App. Div. 556, 565; Scheiberger v. Scheiberg, 264 App. Div. 870, 871.)
Moreover, since the occurrence of the first default on February 2, 1963, Dr. Gritlin and the intervening plaintiff accepted and received benefits under the escrow agreement, particularly the enlarged grace period of four months found only in that agreement. The intervening plaintiff, of course, as the assignee of the purchase-money mortgage from Dr. Gritlin, clearly has no greater rights than he. (Stevenson Brewing Co. v. Iba, 155 N. Y. 224, 227; Rapps v. Gottlieb, 142 N. Y. 164,166-167; Granick v. Mobach, 13 A D 2d 534.)
One of the recitals in the escrow agreement makes it clear that the mortgage note and the mortgage were intended to “be further security for the full and faithful performance by the mortgagee * * * of all the terms, covenants and conditions ” of the lease executed simultaneously on September 19, 1960. In other words, the mortgage note and the mortgage were pledged as security for the performance of the terms and conditions of the lease. (Clark v. Henry, 2 Cow. 324; Matter of People [Title & Mtge. Guar. Co.], 149 Misc. 643, 645, affd. 264 N. Y. 69; Campbell v. Parker, 9 Bosw. 322, 331.)
Yet, Dr. Gritlin, the pledgor, was deprived of the entire ownership of the pledged mortgage by the provision for its summary cancellation of record in the event defaults under the lease continued beyond the four-month grace period provided in the agreement. In effect, then, Dr. Gritlin surrendered his right of redemption, a surrender so inconsistent with our public policy that it has been held that ‘1 even by express agreement made at the inception of the instrument, the debtor may not waive his right to redeem. (Mooney v. Byrne [163 N. Y. 86].) ” (Kirby v. Tricker, 265 App. Div. 149,151; Thompson v. Lewis, 182 App. Div. 556, 559.)
Upon the foregoing basis alone do I find paragraph 10 of the escrow agreement void so far as it permits the owners to “ discharge and satisfy the Mortgage of record ”. This provision is also rendered invalid by the disproportion between the face value of the pledged mortgage and the terms of the lease for which it stands as security.
The lease contains many covenants and conditions of varying importance, for the performance of which the tenant put up this $1,252,000 mortgage as security. In determining whether the amount of this pledge is to be treated as liquidated damages or *238 as a penalty, the covenant for its cancellation must be interpreted as of its date, not by events subsequent thereto. (Dunn v. Morgenthau, 73 App. Div. 147, 149, affd. 175 N. Y. 518.) So interpreted, it is clear that the amount of the mortgage subject to cancellation is so disproportionate with the tenant’s pecuniary obligations under the lease, for the default of which the cancellation was provided for, that a forfeiture results whether the covenant is viewed as of its date, September 19, 1960, or as of December 5, 1963, when the facts for trial were stipulated. As of the latter date, some $205,000 was due as rent and additional rent under the lease. Had that sum been paid, some $83,000 would have been remitted to Dr. G-itlin on account of the mortgage note. Thus, for a net default of about $122,000, the owning defendants claim the right to discharge of record a mortgage given as security upon which the unpaid balance is close to $1,000,000.
It has been held ‘1 that where a contract contains a number of covenants of different degrees of importance and the loss resulting from the breach of some of them will be clearly disproportionate to the sum sought to be fixed as liquidated damages, especially where the loss in some cases is readily ascertainable, the sum so fixed will be treated as a penalty. The strength of a chain is that of its weakest link.” (Seidlitz v. Auerbach, 230 N. Y. 167, 173.) In the case at bar, “ a breach of any covenant [of the lease], however minute or unimportant, is to bring down upon the tenant the loss of the entire security.” (Lenco, Inc., v. Hirschfeld, 247 N. Y. 44, 51.) So strong is the policy in this State against penalties and forfeitures that the tendency of the courts even in doubtful cases “is to favor the construction which makes the sum payable for breach of contract a penalty rather than liquidated damages, even where the parties have styled it liquidated damages rather than a penalty.” (City of New York v. Brooklyn & Manhattan Ferry Co., 238 N. Y. 52, 56; see, also, Manhattan Syndicate v. Ryan, 14 A D 2d 323, 327.) Upon the proof adduced in the case at bar, I am impelled to find the provision for the summary discharge of the mortgage of record to be a penalty.
I perceive no reason why this court of equity may not enforce paragraph 10 of the escrow agreement except so much thereof as has been specifically found to be illegal. Thereupon the mortgage note and mortgage, the personal property that has here been pledged (Stickler v. Ryan, 270 App. Div. 962, mot. for iv. to opp. den. 271 App. Div. 757, mot. for iv. to opp, dsmd. 296 N. Y. 735; Flyer v. Sullivan, 284 App. Div. 697, 698; Nedlin Realty Co. v. Bachner, 223 App. Div. 785), may be ordered sold *239 at public auction in the same manner as any other pledged personal property would be sold upon default of the terms and conditions of a lease for the performance of which such property was pledged. Any other result would be as harsh and inequitable to the defendants as would be the enforcement to the plaintiffs of the provision for the summary discharge and satisfaction of the pledged mortgage of record.
Judgment is accordingly rendered directing the escrowee to perform as required by the agreement and that he be released of his escrow upon delivering the documents to the owning defendants. They, instead of canceling the mortgage of record, will sell it in accordance with the provisions of article 9 of the Lien Law. The purchaser at such sale, whoever he may be (see Lien Law, § 202-b and note of Law Revision Commission [N. Y. Legis. Doc., 1959, No. 65] following said section, McKinney’s Cons. Laws of N. Y., Book 32, Lien Law [1963 Cum. Ann. Pocket Part], p. 162), will of course have the right to deal with the mortgage note and mortgage in the same manner as such choses in action are ordinarily dealt with upon default.