Fritz W. Alexander II, J.
Defendant appears pro se in tins nonjury action wherein plaintiff seeks to recover $740.40 as the balance due on a promissory note executed on August 18, 1969.
We are here presented with a case, that in my view, illustrates graphically the continuing need for vigilance by our courts and the close scrutiny of commercial consumer transactions that have every surface appearance of bona fides but are revealed upon the slightest scratch of that surface to be but another form of a predatory practice already interdicted either by statute or decisional law.
Both the “holder-in-due-course” and “caveat emptor ” doctrines, so long applied by the courts to commercial world transactions, in part, at least, to reflect the sophistication of those persons most frequently engaged in commerce, have, in recent years experienced considerable modification and limitation as a result of our growing recognition of and concern for the less sophisticated and often victimized consumer, who, more and more, forms an important part of our commercial world. As has been stated by the learned court in Matter of State of New York v. ITM, Inc. (52 Misc 2d 39, 54): “We *740 have reached that point where £ Let the buyer beware ’ is a poor business philosophy for a social order allegedly based upon man’s respect for his fellow man. Let the seller beware, too! A free enterprise system not founded upon personal morality will ultimately lose freedom.”
In similar fashion, the traditionally protective shield of the holder-in-due-course doctrine has been penetrated to provide relief to the unsuspecting installment contract purchaser in manner and degree previously denied. (See, e.g., Uniform Commercial Code, § 3-304; Westfield Investment Co. v. Fellers, 74 N. J. Super. 575; Unico v. Owen, 50 N. J. 101.)
But the transaction at bar, at first impression, violates none of these interdictions, modifications or limitations. It appears simply to be an ordinary action on a promissory note brought by the lender against the maker for the unpaid balance.
The note has not been negotiated; it was not given in connection with an installment or other purchase contract between the maker and the lender or one in privity of contract with the lender, nor was the lender a party to any other contractual transaction that apparently underlies the obligation.
This appearance of bona fides is, as will later appear, but the cloak employed to disguise a most pernicious and unconscionable entrapment of an unsuspecting member of the public.
The essential facts found from the testimony of the parties are that defendant’s 18-year-old daughter signed an enrollment agreement to become a student in a ££ Computer Programmer ” course at the New York School of Computer Technology (hereinafter ££ Computer ”), on August 12, 1969. The course, consisting of 500 hours of instruction, included the study of such computers as the ibm 1401, ibm 1440, ibm 1460, ibm 360, Honeywell 200, non 315, boa 501 and Remington Rand Univac, at a total cost of $2,400, payable in full upon enrollment. The student is given the option of attending any hours of the school session that suit his convenience, together with the privilege of changing hours whenever necessary.
The agreement further provides, in considerably smaller, but nevertheless legible print, that “in the event of the student’s withdrawal or discontinuance from the school he will be entitled to a refund equal to the difference between the amount of net cash actually paid to the school and the earned tuition. For the purpose of this paragraph, earned tuition shall consist of a fixed non-refundable enrollment fee of six hundred dollars ($600.00), plus seven dollars ($7.00) per hour for all scheduled instructional hours as checked off in this enrollment agreement *741 until the date of the receipt by the school of written notice of discontinuance. ’ ’
The defendant was asked to come to the school with her daughter so that arrangements could be made for the payment of the $2,400 tuition. She testified that when she went to the school with her daughter on August 18, 1969, she was interviewed by a Mr. Diliberto (later identified as an instructor at the school) and told that in order for her daughter to attend “ Computer,” the daughter would have to pay $67 per month. Defendant was asked if she would ‘ ‘ sign-countersign ’ ’ for the daughter, and, when she agreed, she was asked to sign the promissory note that forms the basis of the instant suit.
While defendant’s recollection of the details was somewhat imperfect, it is clear that she then was asked to indorse a check, ostensibly drawn by the plaintiff to her order in the sum of $2,227.75, which check was retained by Mr. Diliberto, who in turn issued a “Computer” receipt to her for that amount.
The daughter commenced the course of instruction but dropped out after some three or four months of instruction (129 hours by “ Computer’s ” calculations) because she had married and was going to have a baby.
On April 15, 1970, some four months after the daughter had discontinued the course, with the apparent assurance by ‘ ‘ Computer ” that there was “nothing to worry about”, plaintiff wrote defendant dunning her for an alleged balance of $740.40 due on the note she signed. The letter advised that “ Computer ” had “ sent a refund on your account of $1335.60, the difference between $2400.00 and the * # * tuition due to them.”
This ‘ ‘ tuition due ’ ’ was shown to be comprised of a “ nonrefundable enrollment fee ” of $600 and “ 129 hours of scheduled instruction at $3.60 per hour, ’ ’ totaling $464.40, for a grand total of $1,064.40. Asserting that it had “loaned” defendant $2,345.00 (including $117.25 of “ precomputed interest ”), plaintiff acknowledged repayments of $269 from the defendant and demanded immediate payment of the $740.40 balance.
Were this action being prosecuted by “ Computer” for the balance of tuition due under the enrollment contract, it is clear that the conscionability of that contract would be an appropriate inquiry in respect to its enforceability. (Jones v. Star Credit Corp., 59 Misc 2d 189; Central Budget Corp. v. Sanchez, 53 Misc 2d 620; Matter of State of New York v. ITM, Inc., supra; Williams v. Walker-Thomas Furniture Co., 350 F. 2d 445.) A *742 pertinent point of further inquiry would be whether the ‘1 nonrefundable enrollment fee ” of $600 constituted a cognizable liquidated damages provision or a prohibited penalty. (Dalston Constr. Co. v. Wallace, 26 Misc 2d 698; Gitlin v. Schneider, 42 Misc 2d 230; Meltzer v. Old Furnace Development Corp., 44 Misc 2d 552.)
■ Similarly, the appropriateness of the charge of $464.40 for an alleged 129 hours of scheduled instruction would be a proper subject of inquiry, particularly in view of the testimony by plaintiff’s witness that “according to the enrollment agreement, we are entitled to bill 100 hours allowable absences ” and the proof that defendant’s daughter actually received only 96 hours of instruction. She was marked 11 enrolled ” as of July 28, 1969, two weeks prior to the date on which the enrollment agreement was signed and three weeks prior to the execution of the note involved in this suit and thus is being charged for 24 hours of instruction that preceded her actual enrollment.*
Plaintiff argued, however, that ‘1 Computer ’ ’ was not a party to the suit and that any question of a relationship between plaintiff and ‘ ‘ Computer ’ ’ is beyond the scope of the issues involved in this lawsuit. I find, however, upon all the evidence before me, that the relationship between plaintiff and “ Computer ’ ’ is such as to render them indistinguishable in legal contemplation and to depend this plaintiff’s right of recovery upon the enforceability of the ‘ ‘ Enrollment Agreement. ’ ’
The form of the transaction notwithstanding, it is clear from the proof that plaintiff’s sole reason for existence is to serve as a financing resource to which 1 ‘ Computer ’ ’ can direct its prospective enrollees.
The proof shows conclusively that plaintiff makes no loans except to applicants who are students of “Computer”; that such credit information as is solicited from a prospective borrower is obtained and evaluated by ‘ ‘ Computer ’ ’ without any review or approval by the plaintiff; that the preparation and execution of the promissory note all takes place at “ Computer ” offices; that blank, but presigned checks are delivered by plaintiff to “Computer” for use in these financing transactions; that none of the proceeds of the loan are ever actually received by the borrower, but rather the check is immediately indorsed - over to “ Computer ” and the borrower is never made aware *743 in any significant respect that he is dealing with anyone other than “ Computer.” Additionally, the computation of the balance due on the note is made solely by “ Computer,” and accepted by plaintiff in the prosecution of this lawsuit, without opportunity to either the student or the borrower to verify their accuracy or challenge the computation in any way.
Thus I find that this plaintiff was a mere agency or instrumentality of ‘1 Computer ’ ’, and, under these circumstances, this court will not permit itself to be “ blinded or deceived by mere forms of law, but regardless of fictions [of separate corporate entities], will deal with the substance of the transaction involved as if the corporate agency did not exist and as the justice of the case may require.” (Chicago, Milwaukee S St. Paul Ry. Co. v. Minneapolis Civic & Commerce Assn., 247 U. S. 490, 501.) Where it clearly appears that one corporation is but a business conduit of the other, the separateness of the corporate entity may be disregarded. (Pagel, Horton & Co. v. Harmon Paper Co., 236 App. Div. 47.)
While no reported cases have been discovered that deal squarely with the issue here presented, the question of the vulnerability of a “ holder-in-due-course ’ ’ to defenses available against the payee-vendor in consumer credit transactions has been exhaustively considered by the Superior Court of New Jersey in the case of Westfield Investment Co. v. Fellers (supra). The reasoning of the learned Judge Hopkins is deemed particularly apposite to the case at bar because the decision there turned on the question of whether the relationship between the alleged holder-in-due-course (the endorsee-finance company) and its transferor (the payee-vendor) was such as would support a finding that the finance company was so directly interested and involved in the transaction of purchase that it could not escape the legal imputation that it stands in the shoes of the vendor.
In denying holder-in-due-course status to the plaintiff in that action, the court pointed out (p. 585) that: “ Westfield Investment supplied this particular seller, among others, with the conditional sales contract and promissory note forms. [West-field] was mentioned as the specific assignee in bolder type in the conditional sales contract, which, together with the promissory note, was part of a single perforated line sheet of paper. The purchaser’s statement on the reverse side of the sheet was designedly included in order that the purchaser might secure credit from Westfield Investment Company. This court is not about to hold that the mere supplying of negotiable forms in blank by the financing company to a vendor is sufficient to strip the financing company of its holder in due course status. *744 However * * * the supplying of such forms is one of the factors to be looked at in defining the relationship existing between the parties, namely, the vendor, the financing company and the maker.”
I find as a matter of law that the “ Enrollment Agreement ” between “Computer” and defendant’s daughter was unconscionable at the time it was made and, thus, is not entitled to enforcement by this court. (Uniform Commercial Code, § 2-302.)
The enrollment agreement, as previously pointed out, provides for full payment of the total tuition of $2,400 upon enrollment and permits the school to retain a fixed nonrefundable enrollment fee of $600 plus $7 per hour for all scheduled instructional hours checked off. Thus, a student who enrolls and pays the entire fee but attends no classes is nonetheless charged the entire $600, just as would a student who attended 80% of the scheduled instructional hours. It would appear, therefore, that there is no rational relationship between this 1 ‘ non-refundable enrollment fee ’ ’ and any damage 1‘ Computer ’ ’ might sustain as a result of an enrollee dropping out of the course. Thus, it is clear that this provision imposes a penalty and is not a valid liquidated damages provision. (Downtown Harvard Lunch Club v. Rasco, Inc., 201 Misc. 1087; Gitlin v. Schneider, 42 Misc 2d 230.) It, therefore, is clearly unenforceable under the settled law of this State. (City of New York v. Brooklyn & Manhattan Ferry Co., 238 N. Y. 52.)
It might be argued that it would be sufficient to merely deny enforcement of the penalty provision of the contract and sustain the balance of the agreement. I find, however, from all the evidence before me, that in respect to this particular contract, there was a total absence of meaningful choice on the part of the defendant and her daughter, together with terms that were unreasonably favorable to ‘ ‘ Computer ’ ’. Recalling the testimony of plaintiff’s witness that the school was entitled to “ bill 100 hours allowable absences” (a fact not apparent from a reading of the contract and clearly not divulged to the defendant or her daughter), one is constrained to question the equality of the bargaining power of the parties to the agreement, as well as the extent to which the defendant knew and understood its terms.
In the case of Williams v. Walker-Thomas Furniture Co. (350 F. 2d 445, 449, supra) the United States Court of Appeals for the District of Columbia defined unconscionability as including ‘6 an absence of meaningful choice on the part of one of the *745 parties together with contract terms which are unreasonably favorable to the other party.”
The court went on to say that (pp. 449-450): ££ In many cases the meaningfulness of the choice is negated by a gross inequality of bargaining power. The manner in which the contract was entered into is also relevant to this consideration. Did each party to the contract, considering his obvious education or lack of it, have a reasonable opportunity to understand the terms of the contract, or were the important terms hidden in a maze of fine print and minimized by deceptive sales practices?
1 ‘ When a party of little bargaining power, and hence little real choice, signs a commercially unreasonable contract with little or no knowledge of its terms, it is hardly likely that his consent, or even an objective manifestation of his consent, was ever given to all the terms. In such a case the usual rule that the terms of the agreement are not to be questioned should be abandoned and the court should consider whether the terms of the contract are so unfair that enforcement should be withheld.”
This court, while recognizing the importance of preserving the integrity of agreements and the fundamental right of parties to deal, trade, bargain and contract, is nevertheless deeply concerned that consumers who are victims of gross inequality of bargaining power shall be protected against overreaching by those who would prey on them (Jones v. Star Credit Corp., 59 Misc 2d 189, supra) and will withhold enforcement of agreements found to be unconscionable at the time they were made.
Judgment, accordingly, is directed to be entered in favor of the defendant and against the plaintiff, together with costs and disbursements.

 The attendance record, marked as defendant’s Exhibit C, shows slashes in the boxes under dates July 28, 29, 30, 31 and August 4, 5, 6, and 7. September 1 and October 13 are shown as holidays. Plaintiff’s witness testified that “ this slash is a ‘Present.’ Slashes are used as ‘Presents’ by the registrar. The instructor uses ‘P’ as Present”.