**JORDACHE ENTERPRISE, INC., Plaintiff,**

v.

**GLOBAL UNION BANK and Feels Right Company, Inc., Defendants.**

**GLOBAL UNION BANK, Third–Party Plaintiff,**

v.

**Francis BITETTO and Nick Paolino, d/b/a the Little Italy Pizza Shop, Third–Party Defendants.**

No. 85 Civ. 5947(PNL).

United States District Court, S.D. New York.

June 21, 1988.

Lori B. Cohen, Robert A. Spiegelman, Steven M. Gerber, New York City, Blank, Rome, Comisky & McCauley, Philadelphia, Pa. (Arnold I. Kalman, of counsel), for plaintiff.

Graham & James, New York City (Christopher C. Larkin, Victor C. Murphy, of counsel), for defendant, Global Union Bank.

## OPINION AND ORDER

LEVAL, District Judge.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is an action for trademark infringement and false designation of origin under the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, joined with state law claims for trademark infringement, unfair competition, fraud, and breach of contract. Plaintiff is a New York corporation engaged in the business of marketing blue jeans under the registered trademark JORDACHE. Defendant Global Union is a bank in the City of New York.

Global issued letters of credit to finance the importation of jeans by its customer Chapparel Jeans. Around March 1984, Global was advised that U.S. Customs had seized a shipment of jeans imported by Chapparel because the merchandise bore the counterfeit trademark of JORDACHE. As the result of Chapparal's default on the loan, Global became the owner of the seized shipment.

In an effort to recoup some of its losses, Global entered into negotiations with Customs and with Jordache for permission to remove the counterfeit labels and reexport the jeans for sale in Hungary. It proposed by letter of May 14, 1984, to Jordache's lawyer Mr. Spiegelman to maintain a bond to protect the United States Customs and Jordache until the jeans were disposed of in accordance with the suggested understanding.

During the next months negotiations were conducted by telephone between Spiegelman and Global's attorney, Mr. Stern. On July 25, Stern's office wrote again to Spiegelman asking for clarification of the terms Jordache would require to release the jeans. In this letter, Global stated that it would sell the goods in Hungary "and to further guarantee this, we will agree to indemnify you for the sum of $100,000.00 in the event that the jeans were sold in the United States." (Exh. E.)

Spiegelman advised Stern that Jordache would not agree to release the jeans without compensation. After some further negotiation, the parties agreed to split the net proceeds of sale on a 50/50 basis after deducting the expenses of the transaction, including removal of the Jordache trademarks.

Stern wrote Spiegelman on August 2, 1984 summarizing the terms of the agreement. Avvento, an Assistant Vice President of Global Union, wrote a similar letter on August 10, 1984. The jeans were to be stripped of the Jordache labels, made available to Jordache for inspection, and exported for sale to Hungary with a 50/50 split of net proceeds. The letters included an undertaking to:

Maintain a $100,000.00 security indemnification for any violation of the terms hereof to cover Jordache for any damages it may suffer because of any default or breach of the terms hereof.

(Exhs. F., G.)

By letter of August 15, 1984, Jordache accepted the terms of Global's August 10 letter. Global, however, encountered difficulty procuring the removal of the Jordache marks. These were affixed not only by sewn labels but also on riveted metal buttons, which were difficult to remove without damaging the fabric. After considerable delay, Global made arrangements with The Feels Right Company, Inc. for removal of the trademarks. On January 7, 1985, Customs was authorized to deliver the goods to Feels Right for removal of the infringing marks, and did so. Feels Right agreed to do the work within 18 days for $1.10/pair. Feels Right, however, discovered it did not have suitable machinery to remove the buttons.

For two months, nothing happened. Then in March, 1985, Jordache learned that counterfeit Jordache jeans were being sold at a flea market in Brooklyn. Spiegelman sent a chauffeur to buy a sample and found it to be identical to the Global jeans. He then went to the Feels Right warehouse on Bath Avenue to inspect. He learned that the cartons were being stored not at the Feels Right premises, but in the basement of a neighboring pizza restaurant, with little or no security. Many of the boxes had been opened and many jeans were missing. There was no indication that any Jordache labels had been removed.

Jordache arranged to pick up the remaining merchandise and returned it to Customs' custody. Jordache ascertained that 244 of the original 699 cartons were missing, for a shortage of 5,856 pairs of jeans. Stern wrote to Spiegelman acknowledging responsibility for the possession of the jeans. Jordache demanded $211,264 in damages by reason of lost sales and damage to its reputation.

\* \* \*

■ A. Global contends that by arguing in its brief for enforcement of the contractual indemnification, Jordache has abandoned its federal law causes of action, asserting only a state law cause of action. It contends this requires dismissal of the action for lack of federal subject matter jurisdiction.

The contention is frivolous. Jordache's complaint unquestionably asserts a cause of action under the Lanham Act for trademark infringement. Such a claim is properly lodged in federal court under 28 U.S.C. § 1338. *See Kamakazi Music Corp. v. Robbins Music Group*, 684 F.2d 228 (2d Cir.1982); *T.B. Harms Co. v. Eliscu*, 339 F.2d 823 (2d Cir.1964), *cert. denied*, 381 U.S. 915, 85 S.Ct. 1534, 14 L.Ed.2d 435 (1965). In the interest of "judicial economy, convenience and fairness," a federal court may exercise pendent jurisdiction over a state law claim arising out of the same nucleus of operative facts as the federal law claim. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

The fact that plaintiff's post-trial brief focuses on the simpler issue of defendants' breach of contract in no way implies abandonment of the trademark law claims. And even if plaintiff were to abandon its federal law claim at such a late stage, that would not *require* dismissal of pendent claims (although it might permit it). *Carnegie–Mellon Univ. v. Cohill*, —— U.S. ——, 108 S.Ct. 614, 619, n. 7, 98 L.Ed.2d 720 (1988); *Gem Corrugated Box Corp. v. National Kraft Container Corp.*, 427 F.2d 499, 501, n. 1 (2d Cir.1970).

■ Global next contends that Jordache failed to prove its cause of action under the federal or state laws of trademark infringement and unfair competition. Global contends that it is not liable for the theft and subsequent infringement of trademarked goods by strangers. In addition it contends Jordache has failed to prove infringing sales. But in view of Jordache's reliance on its contract, it is unnecessary to answer whether Global is responsible as a contributory infringer, or for its negligence in failing to prevent the infringements, *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 853, 102 S.Ct. 2182,

2188, 72 L.Ed.2d 606 (1982), or the standard of proof for damages in trademark actions. *See Bandag Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 921 (Fed.Cir. 1984).

■ B. Jordache contends that Global is obligated by contract to indemnify it for the damages it suffered. Jordache has unquestionably made out its claim for breach of contract. Global undertook to remove the counterfeit marks and export the jeans. It failed to do so, allowing nearly 6,000 pairs to be lost, probably into the marketplace. Jordache is entitled to a judgment awarding damages for that breach.

The remaining question is the proper amount of damages to be awarded. Jordache claims it is entitled to $100,000 under the contractual indemnification. Global contends that the indemnity clause either establishes no amount of liability or alternatively is void as a penalty clause. I reject the contentions of both parties.

■ 1. Global argues that the indemnity clause was not intended to fix any amount of liability but merely constituted a promise to pay Jordache's actual proven damages up to $100,000. This reading makes no sense whatsoever. An agreement on Global's part to pay a court's judgment would have conferred no benefit whatever on Jordache. The court's judgment awarding damages against Global would have created the obligation to pay, irrespective of the agreement. Such an agreement would have added nothing. To the contrary, such a contract term would only have harmed Jordache by limiting Global's liability to $100,000. Under this reading, Global would have been free to disregard its contract obligations and sell the goods in the United States with counterfeit marks still on them, keeping all proceeds in excess of $100,000. This is clearly not what Jordache bargained for or what the contract intended.

By releasing the counterfeit trademarked jeans to Global, Jordache was taking a risk of damage to its own sales and to its trademark goodwill. If Global failed to remove the counterfeit trademarks and permitted the jeans to be sold in the United States, the counterfeit sales might predictably have cost Jordache sales of its own merchandise and might further have damaged the reputation of Jordache's trademarks. Because sales of goods bearing counterfeit trademarks are generally done surreptitiously, it could be anticipated that Jordache's loss and damages might be difficult to prove. It is entirely reasonable to understand this indemnity clause as Global's inducement to Jordache to take the risk of releasing the counterfeit goods by undertaking to pay damages in a previously agreed amount if Global failed to carry out its commitments.

This is the apparent significance of Global's undertaking set forth in its letters of August 2 and August 10, 1985, to "[m]aintain a $100,000.00 security indemnification for any violation of the terms hereof to cover Jordache for any damages it may suffer because of any default or breach...." (Exhs. F & G.) It is even more clearly the intent expressed in Global's attorney's letter written a few days previously in which he stated "Please understand that we have every intention to sell the goods in Hungary and to further guarantee this, we will agree to indemnify you for the sum of $100,000.00 in the event the jeans were sold in the United States." (Exh. E.) [1]

I find that it was the intention of the parties set forth in their contract-by-exchange-of-letters that Global would pay Jordache $100,000 as compensation for its damages if Global failed to perform its promise to remove the labels and ship the jeans abroad.

■ The remaining issue of interpretation is whether the agreement should be understood to call for payment of the full $100,000 regardless of the number of counterfeit jeans diverted into the U.S. market.

---

**1.** The prior letter is not used to contradict or vary the agreement in derogation of the parole evidence rule. It helps interpret the sketchy and ambiguous language of the final letter agreement.

Defendant argues persuasively that if the agreement requires payment of $100,000 damages no matter how trivial the breach, it is unenforceable. Under New York law, a contractual provision which requires the payment of a sum grossly disproportionate to the amount of actual damages is deemed to be unconscionable and unenforceable. *See Leasing Service Corp. v. Justice*, 673 F.2d 70 (2d Cir.1982); *Truck Rent–A–Center, Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424, 393 N.Y.S.2d 365, 369, 361 N.E.2d 1015, 1019 (1977). In particular, a contract is considered penal and unenforceable if it explicitly calls for payment of the full liquidated damages amount upon any breach of the contract, regardless whether the breach is material or incidental, or whether actual damages are easily ascertainable. *See Seidlitz v. Auerbach*, 230 N.Y. 167, 173, 129 N.E. 461 (1920); *Lenco, Inc. v. Hirschfeld*, 247 N.Y. 44, 159 N.E. 718 (1928) (Cardozo, J.); *National Telecanvass Assoc., Ltd. v. Smith*, 98 A.D.2d 796, 470 N.Y.S.2d 22 (2d Dept. 1983); *Educational Beneficial, Inc. v. Reynolds*, 67 Misc.2d 739, 324 N.Y.S.2d 813 (Sup.Ct.1981). *But see Hackenheimer v. Kurtzmann*, 235 N.Y. 57, 138 N.E. 735 (1923) (Andrews, J.) (liquidated damages clause in contract for use of intangible rights such as trade name should be construed so as to apply to breach only of material terms).

On the other hand, the contract indemnity provision is not disproportionate to loss if the $100,000 figure was intended to apply to Global's breach with respect to the entire shipment. This was a shipment of nearly 17,000 pairs of jeans bearing counterfeit Jordache marks. The release of these jeans into the United States market could easily cause Jordache $100,000 in damages. Such an event could damage Jordache in at least three different ways: (i) by diminishing the sales of Jordache's genuine jeans; (ii) by intangible injury to Jordache's mark resulting from sales of counterfeits; and (iii) by depriving Jordache of its contractually agreed 50% split of the profits expected from the sale of Global's jeans in Hungary.

There was evidence that Jordache jeans sold at retail for $19. If Jordache's revenues from the sale of a pair of jeans exceeded its direct costs by four dollars, a loss of sales of 17,000 pairs would cost Jordache $68,000. If the Global jeans could be sold in Hungary for four dollars more than the costs of label removal and transportation, Jordache's 50% share would amount to $34,000 which it would have lost from the diversion. These rather modest assumptions would thus involve a $100,000 loss for Jordache before any allowance for commercial injury to its mark.

Notwithstanding that the final Global letter of August 20, 1984 spoke of $100,000 indemnification "for any default or breach of the terms hereof," it seems reasonable to construe this language as intending to apply to a loss of the entire shipment. This was the thrust of Global's letter proposal of July 25 in which it undertook "to indemnify [Jordache] for the sum of $100,000 in the event that *the jeans* were sold in the United States." (Exh. E.) (Emphasis added.) (The earlier formulation, although clear in its meaning, would have placed an impossible burden on Jordache to prove that the jeans had been sold in the United States. In the final letters, the indemnity language was broadened inartfully.) The formulation "any breach" is reasonable if it intends to give Jordache the benefit of the assumption that Global's inability to show that it removed the labels and exported the jeans would conclusively establish that the jeans had been sold here in violation of Jordache's trademark and that Jordache suffered $100,000 in damages. It is unreasonable and an unlikely interpretation of the parties' intentions to read "any breach" as giving Jordache $100,000 for the smallest inconsequential technical breach, such as the loss of a single pair of jeans or a day's delay in paying Jordache its share of the proceeds. The gross disproportion of such an indemnity to harm actually suffered would furthermore render the contract unenforceable.

If the $100,000 contractual indemnity is understood to refer to the failure to strip and export the *entire shipment*, it is reasonable to construe the contract as provid-

ing for scaled adjustment in the indemnity amount for such a breach involving a portion of the shipment. Here, where 35% of the shipment was lost, that is the most reasonable interpretation of the contracting parties' intention. A loss of 35% of the shipment requires payment of 35% of the indemnity.

There is authority to the effect that liquidated damages clauses which are disproportionate on their face should not be saved by court interpretation reading in a requirement of reasonable apportionment. *See Brecher v. Laikin*, 430 F.Supp. 103 (S.D.N.Y.1977). I do not believe the New York courts would apply those principles to this case. Hostility to liquidated damages clauses reflects a concern that such clauses are often unconscionably imposed by the stronger, or more sophisticated party on the weaker. *See Truck Rent–A–Center, Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y. 2d 420, 426–27, 393 N.Y.S.2d 365, 370, 361 N.E.2d 1015, 1020 (1977). The rulings also sometimes reflect a recognition that the default for which a defendant is penalized was partially caused by fault on plaintiff's part. *See Mosler Safe Co. v. Maiden Lane Safe Deposit Co.*, 199 N.Y. 479, 93 N.E. 81 (1910); *Babylon Assoc. v. County of Suffolk*, 101 A.D.2d 207, 217, 475 N.Y.S.2d 869, 875 (2d Dept. 1984). None of these factors are present here. This is a particularly suitable case for liquidated damages: it would be difficult for Jordache to learn how the lost jeans were disposed of and to prove the extent of its own lost sales and damaged reputation resulting from sale of the counterfeits. The New York Court of Appeals has recognized that liquidated damages are appropriate where "in the nature of things it is impossible to fix those actually incurred." *Hackenheimer v. Kurtzmann*, 235 N.Y. 57, 67, 138 N.E. 735 (1923). It has thus shown willingness to employ judicial interpretive surgery to save a liquidated damages clause by reading it in a reasonable rather than a literal manner. *See Hackenheimer v. Kurtzmann*, 235 N.Y. 57, 138 N.E. 735 (1923). I believe the same approach would be sustained by the New York courts here.

I therefore construe the indemnity provision as requiring Global to pay Jordache $35,000 or 35% of $100,000 as indemnity for its loss of 35% of the shipment.

\* \* \*

Even if the indemnity clause were not directly enforced, I would reach the same award as a finding of damages sustained by Jordache. The circumstances make it very difficult, even impossible, for Jordache to prove the precise amount of its damages. It cannot prove where the stolen jeans went. It cannot prove how many were sold. Nor can it prove with any specificity how such counterfeit sales affected its sales or damaged the goodwill of its mark. The $100,000 indemnity figure adopted by the parties for the contract is entitled to be considered by the court as evidence of the damages likely to be sustained from a loss of the entire counterfeit shipment into the United States market. The figures considered above in this opinion suggest that such an estimate is reasonable. Thus using the indemnity provision not as a definitive liquidated damages clause but rather as an evidentiary guide, I would conclude that plaintiff has suffered injury in the amount of $35,000 by reason of plaintiff's loss of 35% of the shipment, in circumstances suggesting that those counterfeit jeans were diverted into the United States market.

The court finds that plaintiff has proved its cause of action for breach of contract. Judgment shall be entered for the plaintiff in the amount of $35,000.

SO ORDERED.