Bentley Kassal, J.
This is a nonjury action to recover $539.66, the balance due on a contract for tuition and fees for a “ Data Processing Technician Course.” Defendant counterclaims for the money he paid to the school.
FACTS
The essential facts are: On February 15, 1973 the defendant went- to the Albert Merrill School (hereafter AMS), to apply for admission to a “ computer course. ’ ’ After being interviewed as to his goals and background, he ¡took a written test. The interview, the test and proof of high school graduation or equivalent (defendant produced an equivalent certificate from Puerto Rico) satisfied the entrance requirements.
Defendant paid a small deposit with his application and by the first day of classes on March 19, had paid almost $300. On August 19, 1973 after having paid $983.20 and having attended about 70% of the course he notified the school of his intention not to complete the course.
ISSUE
Should ¡the court exercise its power to determine whether this agreement is unconscionable and, if so, to what extent should the application of the agreement be limited .to avoid an unconscionable result? (Cf. Sinkoff Beverage Co. v. Schlitz Brewing Co., 51 Misc 2d 446; Uniform Commercial Code, § 2-302.)
Had the contract been a normal business agreement between two parties on equal footing, probably at this stage there would be a judgment for the plaintiff. However, the case came before the court as an action against a pro se consumer, and, this therefore, requires further probing by the court. Such investigation reveals that such a judgment would produce an unconscionable result.
UN CONSCIONABILITY
The doctrine of unconscionability is not new to American jurisprudence (see, e.g., Scott v. United States, 12 Wall. [79 U. S.] 443; Hume v. United States, 132 U. S. 406, but prior to the adoption of the Uniform Commercial Code no more than a handful of decisions had rested on that theory. While article 2 of the Uniform Commercial Code, including section 2-302. deal *649 ing with unconscionability, governs only contracts for the sale of goods, from its inception it was predicted that the rule would be followed, by analogy, in cases involving other types of contracts. (Cf. Remarks of Professor Llewellyn, State of New York Law Revision Commission Report and Record of Hearings on the Uniform Commercial Code, pp. 108-110 [1954].) It has already been applied in New York in several areas, such as, a real estate brokerage agreement (Burman Realty of Lindenhurst v. Allen, 76 Misc 2d 773); a computer programmer instruction course (Educational Beneficial v. Reynolds, 67 Misc 2d 739) and a jury trial waiver clause in fine print on a bank “ signature •card ” (David v. Manufacturers Hanover Trust Co., 55 Misc 2d 1080).
The best definition of the modern doctrine of unconscionability appears in .the majority opinion in Williams v. Walker-Thomas Furniture Co. (350 F. 2d 445) written by Judge J. Skelly Weight before the Uniform Commercial Code was effective in Washington, D. C., but which has since been cited as setting' the guidelines even where the defense is raised under the Uniform Commercial Code. (Matter of State of New York v. ITM, 52 Misc 2d 39.) As Judge Weight stated, the definition includes “ an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.” (Williams, supra, p. 449.)
The existence of meaningful choice can be determined only by examining all the circumstances surrounding the transaction arid may be “ negated by a gross inequality of bargaining power.” (Williams, supra, p. 449.) It is also relevant to determine whether “ each party to the contract, considering his obvious education or lack of it, have a reasonable opportunity to understand the terms of the contract, or were the important terms hidden in a maze of fine print and minimized by deceptive sales practices? ” (Williams, supra, p. 449.)
FACTORS IN DETERMINING UNCONSCIONABILITY
1. EDUCATION
The disproportionate levels of education between plaintiff and defendant herein are obvious. The extent of the defendant's education was represented by an equivalent certificate from Puerto Rico. On the other hand, plaintiff’s witness, the director of AMS, had earried a Master of Science in Education. Moreover, the defendant went to AMS to benefit from the superior education of the instructors and administrators and relied on their judgment. '
*650 2. LANGUAGE
Language ability, like education is relevant in determining equality of bargaining power. (Frostifresh Corp. v. Reynoso, 52 Misc 2d 26, revd. on other grounds 54 Misc 2d 119.) It was apparent throughout the trial of this matter that the defendant had a reasonable though limited comprehension of day to day English language usage. On technical or legal issues, however, he demonstrated an uncertainty with various terms and difficulty in expressing himself often found in people in this city for whom English remains a second language. (For these reasons, an interpreter was used throughout the trial.) In this case the issue of defendant’s lack of facility in the English language is relevant to the' question of equality of bargaining and the reasonableness of the contract.
3. DECEPTIVE PRACTICE
Deceptive practices in negotiating may further tip .the balance of equality of bargaining power. Where, as here, the contract provides for a sliding scale of charges upon withdrawal, deceptive practices during the term of the contract are significant.
As previously stated, defendant enrolled in this course of instruction only after he was advised he had met the admissions criteria. As stated on page 11 of the AMS brochure (referred to on trial and submitted by both sides after trial) “ AMS agrees to consider you for admission on the basis of an Aptitude Test evaluated by a responsible career representative. A personal interview with a member of the Admissions Department is required to determine the program best suited for your capabilities and goals.” “ [P]ass school’s test ” is listed as an entrance requirement on page 14 of the same brochure and reference is made to “ the AMS Aptitude Test ” on the application for admission and enrollment agreement which embodies the terms of the contract herein. Plaintiff testified that defendant obtained a score of 38 on the test which had a maximum score of 60 and a passing score of 35, and therefore defendant was offered admission.
The potential for misleading provided by such tests is well documented. As stated by the New York City Department of Consumer Affairs (hereafter DCA) in its explanation to Consumer Protection Law regulation 19: “ The Department of Consmer Affairs has found that private vocational trade or home Study schools frequently use “ aptitude ” tests to determine eligibility for enrollment even though the tests used have never been shown to measure the skill or ability needed to perform *651 well in the field. Also, schools often give passing grades on the aptitude test to virtually all applicants. Both these practices have the effect of misleading prospective enrollees. The prospect may mistakenly believe that the school can determine his aptitude or ability or that the use of the aptitude test means that the school is highly selective. Both these misapprehensions may lead the prospect to believe that he should enroll in the course (often at considerable expense) when in fact he has little ability in the field and little prospect of obtaining employment (Emphasis added.)
In response to this finding, regulation 19 provides that it is a “ deceptive practice ” in connection with the offering of services at any private vocational or trade school to: “ represent orally or in printed advertising that it uses an aptitude test to determine eligibility for entry into the school or course unless: (a) the percentage of applicants who pass the aptitude test on an annual basis is stated at least as prominently as the existence of the test; and (b) the aptitude test has been independently validated using professionally sanctioned standards.”
Nowhere in plaintiff’s brochure or application/agreement form is a passing rate stated and the AMS director testified on trial that such information is not given to applicants. Nor was ■he able to state the rate when questioned. As to condition (b), he stated that the test was supplied by the Psychological Corporation and approved by the New York State Education Department (hereafter NYSED).
Plaintiff contended the test in question is not an aptitude test, but an achievement test or a mechanical reasoning test. I find this argument without substance since the effect of the advertising would be the same whether or not the test in question is technically an “ aptitude ” test.
Finally, plaintiff argues that the DCA regulation is preempted by the NYSED. Without reaching that question the court notes that the regulations of the NYSED, section 126.10 (subd. ]c[, par. [2]) (of the Regulations of the 'State Education Department (8 NYCRR 126.10 [c] [2]), provide that: “ registration of students shall not be sought by * * * misrepresentation by statement, inference or omission of the * * * education, experience or abilities required for successful completion of the course ”.
Thus, it is clear that on the basis of either regulation public policy dictates further disclosure to avoid, deception.
Whether or not the defendant should have been warned that he might not be qualified on the basis of the entrance examina *652 tion, his performance during the period of his attendance should have alerted plaintiff of such concern.
In his first test, on April 24, defendant received a score of 40. Thereafter he received 45 on May 15, 52 on June 28 and 60 on August 16. Never once did he receive a passing grade of 70.
Defendant testified he became very depressed after his second examination and spoke with his instructor. The instructor told him not to be “ chicken,” that his grades were improving and that he should stick it out. After another failing grade defendant’s wife went to the school for an explanation. She was told that there were great benefits to those who graduated and that her husband should give it one more try. Finally after failing the August examination plaintiff withdrew.
Inability or disinclination of consumers to complete future services contracts for instruction or other services is a common phenomenon. In response thereto various regulations now require that such contracts provide for reduction of charges on the basis of the date of cancellation. Where, as here, the defendant is encouraged not to cancel in spite of an obvious showing that he is not receiving the full benefit of the educational services he seeks, the proportional cancellation charge provision loses any meaningful effect.
The court believes that the defendant would have canceled the course no later than when he received the results of the second examination had he not been told throughout that he was qualified and that he should continue. I, therefore, find that defendant is entitled to recover the difference between the amount he paid and what he would have owed if he had canceled on May 15. Judgment for defendant on counterclaim $97.90* plus interest from May 15,1974 costs and disbursements.

 (The sum of $97.90 is determined by use of the formula on the AMS application/ agreement: — The number of classes actually attended (20) plus the number of absences, limited to a maximum of 20% of actual attendance (4) is multiplied by 4 1/6 to determine the number of hours (100). Multiplying this figure by the hourly rate of $4.14 produces $414. This, in turn, is added to a fixed charge of $375 for registration and tuition and a sum of $96.30 for textbooks and supplies, for a total of $885.30. Since defendant has already paid $983.20 he is entitled to the return of $97.90.)