*570 OPINION OF THE COURT
Margaret Taylor, J.
Plaintiff, Michael Joyner, was born in Mexico in 1919. His formal education was limited to completing the sixth grade of primary school in Mexico. He never attended high school nor did he obtain a high school equivalency certificate. He speaks English with a pronounced accent. He has been employed at the same job for 22 years as a factory worker, earning less than $5,000 per year.
In June, 1969, as a result of reading subway advertisements and seeing television commercials offering a promising career at a good salary, plaintiff visited defendants’ school to inquire about obtaining training as a computer programmer. He was interviewed at that time by a representative of defendants, a Mr. Pardes. In the course of that interview plaintiff informed Mr. Pardes of his correct age and limited education. Despite plaintiff’s limited educational background and difficulty with the English language, Mr. Pardes administered a so-called "aptitude” test. Plaintiff was unable either to understand or complete this test during the time usually allotted and it was necessary that he be given additional time by the tester.
Following his "testing” by defendants’ representative, plaintiff was given a "B+” score on the aptitude test. The significance of this score and the validity of the test as a measure of an applicant’s "aptitude” for computer programming/data processing could not be determined inasmuch as defendants failed to produce the test questions, although a notice had been served by plaintiff’s counsel requesting, among other things, the production at the trial of "all of the original records maintained by defendants pertaining to plaintiff’s schooling.”
After advising plaintiff that he had scored a "B+” on his "aptitude test” defendants’ representative told plaintiff that "he had a good head, worth a $10,000 job.” Plaintiff was further assured that the school would place him in such a job following his completion of the course. Plaintiff told Mr. Pardes that his only purpose in taking the course was to get a job.
The "aptitude” test answer sheet, reviewed by Mr. Pardes, also contains notes made by the person who corrected plaintiff’s test. These notes indicate that plaintiff was a high school graduate, when, in fact, plaintiff had advised Mr. Pardes of his *571 limited grade school education, and, further, that plaintiff was a loan applicant.
Following this conversation and the testing, plaintiff completed an “Application for Admission” to an IBM data processing/computer programming course offered by defendants. All plaintiff had to do was print his name, address and date of birth and then sign on an indicated line on the front of the document. Plaintiff did not read this "application”. He just signed it. Significantly, he never received a complete copy of the "application” but only a photocopy of the front portion.
On the reverse side of the "application” the following appears, inter alia:
"1. I understand that this application, if accepted by the school, constitutes a binding contract.
"2. I understand that this application contains all the terms of the contract * * *
"9. I understand that upon successful completion of the course, I will be eligible for the services of the school’s placement department for free job counseling. I further understand that this is not a guarantee of a job or an offer of employment.”
By signing the application, plaintiff enrolled himself in a $1,468.90 course offered by defendant in data processing/computer programming consisting of "360 class hours in the theory and practical operation of IBM tabulation machines; (29 Card Punch, 82 Sorter, 85 Collator, 514 Reproducer, 548 Interpreter, 403 Accounting Machine) and the programming of IBM Computers (1401 Data Processing System and IBM System/360).”
Plaintiff began school in July of 1969. Shortly thereafter, on two separate occasions, a representative of the defendants asked him to leave the evening classes he was attending and presented him with documents to sign. Plaintiff signed the documents but was not given an opportunity to read them nor any explanation as to what they contained or their general import. Subsequently, plaintiff was informed by Mr. Pardes and the school director at graduation that by signing the documents he had applied for $1,500 in New York State tuition loans but that these loans would not become due until he had obtained the position promised him by defendants in the computer programming industry. Copies of the agreements were never provided to the plaintiff nor were they *572 produced by defendants at the trial although called for by the notice to produce served by plaintiffs attorney.
Plaintiff attended over 360 hours in classes offered by defendants without any absence. During these classes he repeatedly informed his instructors and other representatives of defendants that he was unable to comprehend the subject matter of the courses. He told them that "he wanted to quit and didn’t want to lose money.” The school director, however, discouraged plaintiff from exercising his contractual right to withdraw from the course and obtain a refund, advising him "not to panic; everybody here graduates.” Plaintiff was repeatedly assured that his concern was unfounded, that it was only necessary that he complete the course and defendants would then place him in a good job with a high salary.[1]
Plaintiff completed defendants’ regular course in April, 1970, although he never comprehended the tests administered to him. The students were given open book tests, during which they were permitted to copy from other students’ examination papers, in the presence of a teacher. Upon completion of the course, plaintiff still could not understand the computer programming/data processing field, and arrangements were made for him to attend supplemental classes through the spring of 1971.
After completion of both the regular and supplementary courses, and extending through the spring of 1975, plaintiff visited defendants’ placement office seeking the job that was promised him. A resumé was prepared for him by that office. The resumé contained a false date of birth, 1931, rather that 1919. Plaintiff was advised by representatives of defendants that he could not obtain employment in the computer industry unless he was under 40 years of age. The resumé, prepared by defendants’ placement office, also indicates, erroneously, that plaintiff completed two years of high school and a bookkeeping course, and, further, presents a blatantly distorted description of plaintiff’s present employment.
During the five years following completion of the data processing/computer programming course, plaintiff went on 50 to 60 job interviews. At no time could he pass any of the *573 tests administered by prospective employers and received no job offers.
This bubble of false promises and misplaced expectations was not burst until the spring of 1975 when defendants finally advised plaintiff that no jobs could be found for him. A default judgment on his tuition loan was entered against him in Supreme Court, Albany County, and his life savings of $500 were seized. Threatened with an attachment on his meager salary, plaintiff, to avoid the possible loss of his job, made monthly payments to the Sheriff of New York County.
Convinced that he had been deceived, plaintiff then sought legal assistance. He obtained counsel who instituted this action for breach of contract for failing to find the employment which defendants promised, for fraud and misrepresentation in inducing the plaintiff to enter into the contract for training, and for punitive damages.
Defendants produced no witnesses and no documents except for the "Application for Admission”. They relied initially on their claim that plaintiff’s action was barred by the Statute of Limitations. Defendants’ reliance on the Statute of Limitations is not well founded. An action based on fraud does not accrue until six years from the date of the fraud, or two years from the date the fraud is discovered or could, with reasonable diligence, be discovered. (CPLR 213, subd 8; 203, subd [f].) Plaintiff can use "whichever date is longer”. (Siegel, NY Prac, § 43; Azoy v Fowler, 57 AD2d 541; Klein v Shields & Co., 470 F2d 1344.) Similarly, a cause of action based on breach of contract does not accrue until the alleged breach has occurred.
The record clearly establishes that defendants continued plaintiff in their program through the spring of 1971 and repeatedly misled him as to his employment prospects until at least the spring of 1975. Defendants did not disillusion plaintiff as to his promised job opportunities until that time.
Based on the testimony at trial and an evaluation of the credibility of plaintiff, the only witness called, the court finds that the plaintiff did not and could not have discovered the fraud until the spring of 1975. Thus, both under plaintiff’s cause of action for fraud and for breach of contract, plaintiff’s claims are timely. Both causes of action accrued either in the spring of 1971 when plaintiff completed his schooling or in the spring of 1975. Suit was commenced in February, 1977, less than six years after he completed his schooling and less than *574 two years after defendants finally admitted to him that they could not place him in a job in the computer industry.
It is necessary to determine, therefore, whether plaintiff has established his claims of breach of contract and fraud and misrepresentation. Our courts and Legislatures recognize the need for close scrutiny of commercial consumer transactions to guard against predatory practices calculated to take advantage of the unwary consumer. The doctrine of caveat emptor has given way, at least in part, to the doctrine of caveat venditor in recognition of the fact that many consumers, by reason of their lack of education, lack of experience, and limited bargaining power, are not in equal bargaining positions with the vendors with whom they deal. (Albert Merrill School v Godoy, 78 Misc 2d 674; Educational Beneficial v Reynolds, 67 Misc 2d 739.)
The court finds, on the record before it, and on the facts set forth above, that the defendants fraudulently induced plaintiff to enter into a data processing/computer programming course by admitting him to their program and by falsely promising to place him in a job in the data processing/computer programming industry at a salary of $10,000 per year upon completion of the course. The high grade given to plaintiff on defendants’ so-called "aptitude” test was clearly calculated to mislead and deceive him. In spite of his repeated statements to his instructors and other representatives of defendants that he did not understand the training, plaintiff was encouraged to remain in the program with defendants promising to find him employment once he completed the course. Plaintiff made it clear he would not have entered or continued in defendants’ program if they had not promised him a job.
Defendants argue that the statement contained on the reverse side of its "application” that the job counseling it offers "is not a guarantee of a job or an offer of employment” bars recovery in spite of the promise made by its representatives. However, it was uncontroverted at trial that plaintiff did not read the application and that he was not given a copy of the back of the application containing defendants’ alleged "merger” and "immunity” clauses. Assuming, arguendo, plaintiff did read and was given a copy of the back of defendants’ application, it is a well-established principle of law that fraud vitiates the parol evidence rule. (See, e.g., Danann Realty Corp. v Harris, 5 NY2d 317; Suburban Lawn Serv. of Midis- *575 land v Allstate Ins. Co., 68 Misc 2d 1010.) The court finds therefore that despite the language contained on defendants’ form "application”, defendants did promise plaintiff a job in the data processing/computer programming industry as an inducement for him to enter into the contract. Further, the court finds that defendants’ conduct in enrolling plaintiff in the program, discouraging him from withdrawing and continuing, until 1975, to encourage in him false hopes of a "good job and salary” was calculated to induce plaintiff not to exercise his contractual right to terminate the contract or his right to take legal recourse against the defendants.
The general merger clause contained in defendants’ "application”, "I understand that this application contains all the terms of the contract”, may not be invoked to exclude evidence of fraudulent oral statement by defendants. (Sabo v Delman, 3 NY2d 155; Barash v Pennsylvania Term Real Estate Corp., 26 NY2d 77.) A limited rule evolved in this jurisdiction in 1959 to the effect that where a merger clause recites that a specific representation has not been made orally and that the buyer has not relied on any representation other than those appearing in the contract and, further, where the buyer has had the opportunity to discover the true facts, there is a specific disclaimer and a plaintiff cannot prove reliance on the oral representation in a cause of action for fraud. (See, e.g., Danann Realty Corp. v Harris, 5 NY2d 317, supra; Wittenberg v Robinov, 9 NY2d 261; Cohen v Cohen, 1 AD2d 586.)
The general merger clause contained in defendants’ "application” combined with the statement contained in paragraph 9 of that application: "9. I understand that upon successful completion of the course I will be eligible for the services of the school’s placement department for free job counseling. I further understand that this is not a guarantee of a job or an offer of employment” does not come under the rule stated in Danann (supra). This langage failed to constitute a specific disclaimer by plaintiff of reliance upon defendants’ fraudulent misrepresentation. Absent a sufficiently specific disclaimer which would negate the element of reliance, plaintiff cannot be barred from asserting his claim of fraud against defendants. (Galgani v Fleming, 56 AD2d 644; accord United States v Amrep Corp., 560 F2d 539; Crowell-Collier Pub. Co. v Josefowitz, 9 Misc 2d 613, affd 6 AD2d 791, affd 5 NY2d 998; Zamzok v 650 Park Ave. Corp., 80 Misc 2d 573.)
*576 Even if a specific disclaimer of reliance were contained in defendants’ contract, plaintiff’s cause of action for fraud would not be barred unless he also had an opportunity to discover the true facts. (Danann Realty Corp. v Harris, 5 NY2d 317, supra.) In this way sellers cannot, by careful drafting, immunize themselves against claims of fraud, (see Crowell-Collier Pub. Co. v Josefowitz, supra.)
Proper emphasis must be placed on the factual background surrounding plaintiff’s entry into the contractual relationship with the defendants. Plaintiff was 52 years old and had a sixth-grade education at the time he signed the "application”. Plaintiff obviously had difficulty with English as his second language. It was necessary for him to use an interpreter during the trial. The "application” was printed and prepared by defendants with no input by plaintiff as to its terms. Plaintiff acted at all times in reliance upon the defendants’ expertise in the computer industry and education field. At no time was plaintiff on equal footing with defendants. In this posture no consumer can be said to have an opportunity to discover the true facts.
The court finds, therefore, by a preponderance of the credible evidence, that defendants fraudulently induced plaintiff into a contract for vocational education, knowing that plaintiff was not by training, education or background capable of absorbing or using their particular training program.[2] As a result, plaintiff was damaged in the amount of $1,486.90.
The court will now deal with the issue of punitive damages. Punitive damages are recoverable in fraud actions where the fraud is gross and involves high moral culpability. (Walker v Sheldon, 10 NY2d 401.) Punitive damages are not only available in cases of wanton and malicious fraud directed *577 at a specific individual but in cases of consumer fraud. The Court of Appeals in Walker established the principle that the assessment of exemplary or punitive damages serves the purpose of deterring fraudulent consumer sales. (Walker v Sheldon, supra; Star Credit Corp. v Ingram, 75 Misc 2d 299.) And if punitive damages are to be awarded to protect the public from continuation of a fraudulent consumer scheme, they must be taxed in an amount which will accomplish that purpose. (Nitti v Credit Bur. of Rochester, 84 Misc 2d 277.)
The facts here show that defendants admitted plaintiff despite his obvious lack of educational qualifications. Plaintiff was induced to enroll in defendants’ course with a false promise of employment. Defendants knowingly continued to mislead plaintiff with a promise of a $10,000 a year job in the computer programming/data processing industry despite defendants’ knowledge that by virtue of plaintiff’s age, lack of education and the state of the job market, plaintiff could never secure such employment.
Punitive damages are necessary here to prevent defendants in the future from defrauding those similarly seeking to improve their training and employment. As a consequence of defendants’ deceptive practices, plaintiff wasted his valuable time and, to him, a considerable sum of money. Plaintiff seeks only $2,500 in punitive damages. The court is restricted to that demand and, accordingly, punitive damages are hereby assessed at $2,500. The court would, however, have been willing to assess a greater sum to serve as a more convincing deterrent to the defendants and to discourage them from engaging in the future in the deceptive sale of courses neither suited to an applicant’s needs nor the job market.[3]
The clerk is directed to enter judgment in favor of the plaintiff against the defendants in the amount of $3,968.90, together with appropriate interest, costs and disbursements.

. The court believes that the plaintiff would have withdrawn from the course had he been paying tuition while taking the course. But the defendants were unconditionally guaranteed the payment of tuition as long as plaintiff completed the course, regardless of their success or lack of success in training him.

. It should be clearly understood that this court is in no way suggesting that plaintiff should not have the opportunity to attend a computer programming school or improve his education, career or salary. But defendants enrolled plaintiff in their program without giving any consideration to his possibilities for success. Whereas some colleges and universities have embarked on "open enrollment” programs in which unprepared students are placed in courses specially tailored to their educational needs, there is no evidence that defendants made any perceivable effort to provide unprepared students with special assistance. Had plaintiff been given an aptitude test that accurately measured his potential for success in the computer industry, had admissions officers provided him with an honest assessment of his chances of successfully completing the course and obtaining employment, and had he been offered special educational and supportive services or, in the alternative, -been advised that none were available but that other educational options existed, perhaps plaintiff’s realistic hopes of improving his position and salary would have been actualized.

. The abuses revealed by the record in this case were subsequently specifically prohibited by various statutes and regulations and examined in detail by State and Federal authorities. (See, e.g., Education Law, § 5002, requiring, inter alia, a high school diploma or certificate of equivalency for admission to vocational school; New York City Dept of Consumer Affairs Regs Nos. 5 and 19, regarding vocational school advertising and aptitude tests; 8 NYCRR 126.3 and 126.7, regarding vocational school advertising and enrollment agreements.) See, also, report of the New York State Consumer Protection Board of July 20, 1978 entitled "The Profits of Failure: The Proprietary Vocational School Industry in New York State” and Federal Trade Commission Report entitled "Proprietary Vocational and Home Study Schools” (Dec. 10, 1976) and the proposed regulations published therein.