OPINION OF THE COURT
Thomas A. Dickerson, J.
The plaintiff Khary Cambridge (Khary) was employed in 1994 by the defendant Telemarketing Concepts, Inc. (Telemarketing) as a sales representative.
The 1995 Scholarship Program
In 1995 Telemarketing instituted a scholarship program for its employees. The program was entitled the "Telemarketing Representatives 1995 Scholarship Plan” (the Scholarship Plan). To take advantage of the Scholarship Plan, Telemarketing’s employees had to meet the following conditions:
"1) The scholarship earning period begins August 1, 1995 and runs through August 31, 1996. Applicants must begin the program between August 1, 1995 and September 15, 1995.
"2) Your regular weekly schedule must include Friday night or a Saturday with a minimum of 20 hours per week.
"3) You must work a minimum of 800 hours during the period according to your regular weekly schedule.
"4) All standard performance guidelines apply including attendance, punctuality and Total Quality Performance.
"5) Reps who meet the above guidelines will receive a $1,000 scholarship to any accredited school of higher education.
"6) The scholarship check will be payable to the institution of your choice.
"7) All high school seniors, college students and students of all ages are eligible to participate.”
The Scholarship Plan Agreement
Khary read the flyer, relied upon it and decided to avail himself of the Scholarship Plan. At Telemarketing’s request he signed a "Scholarship Plan Employee Agreement” (the Agreement), wherein he agreed "to meet the following terms and conditions to receive a $1,000 scholarship”:
"1) I will be continuously employed by Telemarketing Concepts, Inc. from August 1, 1995 through August 31, 1996. During this time I will accumulate a minimum of 800 paid hours.
*798 "2) My regular weekly schedule will include Friday night * * * or Saturday shifts * * * throughout the entire period.
"3) Throughout the entire period, I will maintain an acceptable level of performance including (but not limited to) productivity, proficiency, attendance and punctuality.”
The Monthly Evaluations
Every month Telemarketing evaluated Khary’s compliance with the terms and conditions of its Scholarship Plan (the Evaluations). The Evaluations reveal that during the period August 28, 1995 to August 1, 1996 Khary worked 1,377 hours. In addition the Evaluations contain sections for monthly comments on Khary’s "Attendance”, "Performance”, "Productivity” and "Attitude”. There is not a single negative comment in any of the Evaluations about Khary’s performance, attendance, productivity or attitude.
The Probationary Report
On January 22, 1996 Telemarketing gave Khary a "Notification of Probationary Status” (the Probationary Report) wherein he was informed that his "attendance * * * hours are well-below acceptable standards. The minimal acceptable hours are 20 hours per week. Your attendance for the past 2 weeks has been * * * inconsistent. As a condition of continued employment, you are required to meet or exceed the minimum acceptable hours”.
Although the Probationary Report accused Khary of working less than "20 hours per week”, Telemarketing’s own Evaluations clearly reveal that he worked in excess of 25 hours per week during the entire period (Sept. 1, 1995 to Feb. 1, 1996) preceding the Probationary Report.
Apparently, Telemarketing’s real complaint was that Khary had not worked three or four Saturdays during this period ("Khary has been warned. If he missed one more Satjurday] he would be terminated”). The Scholarship Plan required that the employee’s "weekly schedule * * * include Friday night or a Saturday”. After discussing the Probationary Report with his supervisor Khary agreed to work every remaining Saturday during the scholarship period. And, in fact, he did so without any further complaint. At no time was Khary informed that *799 the issuance of the Probationary Report* made him ineligible for the $1,000 scholarship.
Khary Is Fired
The Scholarship Plan’s "earning period” began on August 1, 1995 and ended on August 31, 1996. On August 6, 1996, just three weeks before the end of the "earning period” when Khary would be eligible for the $1,000 scholarship, he was fired for insubordination. Telemarketing asserted that he had been abusive to a fellow employee, a charge which Khary disputed.
No Scholarship For Khary
Khary demanded that Telemarketing honor its Agreement and award him a $1,000 scholarship. He claimed that he had substantially complied with the conditions of the Scholarship Plan and was improperly terminated.
Telemarketing refused to award Khary the $1,000 scholarship for the following reasons. First, Khary was supposed to work one full year but did not. Second, Khary was put on probation for not working Saturdays. Third, Khary was fired for insubordination.
DISCUSSION
Based upon the foregoing the court finds that the plaintiff has asserted the following cognizable causes of action against the defendant: (1) breach of contract, and (2) violation of General Business Law § 349 (deceptive and unfair business practices).
Employer Scholarship Programs
It is quite common for corporations (see, e.g., Dinkins v Farley, 106 Misc 2d 593 [1980] [Xerox Corp. advanced 100% of tuition cost and deducted 35% thereof from employee’s paychecks] and governments (see, e.g., State of New York v Fleischer, 64 Misc 2d 1086 [1970] [State sues former employee for reimbursement of salary and tuition paid pursuant to scholarship plan]) to encourage their employees to enroll in educational programs. Such encouragement, typically, involves the payment of the tuition costs of job-related college courses administered through a scholarship program.
*800 The scholarship program may take the form of a written agreement to finance tuition costs in consideration for the employee agreeing to certain job-related conditions (see, e.g., Din-kins v Farley, 106 Misc 2d 595, supra; State of New York v Fleischer, supra, at 1088-1089 [employee must return to position of caseworker]), or a negotiated benefit under a collective bargaining agreement (see, e.g., Matter of Educational Fund v United States, 426 F2d 1053 [2d Cir 1970] [$140 payment for attending annual one-week course in civics taxable as wages]).
Educational Policy
Although the Agreement between plaintiff and defendant was not one between a student and an educational institution it, nonetheless, involves the aspirations of a young person to better himself through education. Such aspirations are imbued with the public interest.
The courts of New York State have traditionally been vigilant in scrutinizing agreements involving education services (see, e.g., Brown v Hambric, 168 Misc 2d 502, 506-507 [1995] [prospective travel agent defrauded by pyramid scheme masquerading as educational program]; Joyner v Albert Merrill School, 97 Misc 2d 568, 574 [1978] ["(courts must carefully examine) commercial consumer transactions to guard against predatory practices calculated to take advantage of the unwary consumer”]; Albert Merrill School v Godoy, 78 Misc 2d 647, 648 [1974] [action against pro se consumer requires "further probing by the court”]; Educational Beneficial v Reynolds, 67 Misc 2d 739, 745 [1971] [concern that "consumers who are victims of gross inequality of bargaining power shall be protected against overreaching”]).
Breach Of Contract
There was a contract between the parties whereby the plaintiff agreed to (1) work from August 1, 1995 to August 31, 1996; (2) work for a minimum of 800 hours; (3) incorporate a Friday night or a Saturday into his weekly work schedule; and (4) work at an "acceptable level of performance including * * * productivity, proficiency, attendance and punctuality”. In consideration for complying with these conditions the defendant agreed to pay a $1,000 scholarship to "the (educational) institution of your choice”.
Khary Worked Hard
It is clear that plaintiff worked more than the minimum 800 hours, he worked in excess of 1,377 hours. It is clear that *801 plaintiff responded to the Probationary Report in a positive manner and worked all remaining Saturdays without further complaint. Certainly, the plaintiff was never informed that receipt of the Probationary Report made him ineligible for defendant’s $1,000 scholarship. As far as plaintiff’s attendance, performance, productivity and attitude are concerned the defendant’s Evaluations contain not a single negative comment thereon.
Khary Worked Long Enough
Defendant contends that it fired plaintiff three weeks before the end of the scholarship "earning period”, and, hence, he failed to work the required one year under the Scholarship Plan. It is not at all clear just how long employees had to work to become eligible for defendant’s scholarship. For example, the Scholarship Plan states that the "earning period” "begins August 1, 1995 and runs through August 31, 1996”. Instead of the required one year it would appear that employees had to work 56 weeks. Yet employees could sign up for the Scholarship Plan as late as "September 15, 1995”, six weeks after the "earning period” began. Hence, the $1,000 scholarship could be awarded to an employee who worked 56 weeks, i.e., more than one year, or 50 weeks, i.e., less than one year.
The plaintiff was hired in 1994 and was working for defendant on August 1, 1995 when the "earning period” began. If this date is used to determine when the "earning period” began then plaintiff would have worked 53 weeks before he was fired. The plaintiff signed up for the Scholarship Plan on August 28, 1995. If this date is used to determine when the "earning period” began then plaintiff would have worked nearly 50 weeks before he was fired.
Why Was Khary Fired?
The circumstances surrounding plaintiff’s termination were not fully developed at trial. Defendant did not produce the employee who was the recipient of plaintiff’s allegedly abusive language. Defendant’s supervisor who fired plaintiff was not present during the incident. In addition, the absence of any negative comment regarding plaintiff’s job performance in the Evaluations undercuts the credibility of defendant’s position that there was a legitimate reason for firing the plaintiff.
The court finds that plaintiff substantially complied with all of the conditions of Telemarketing’s Scholarship Plan. The defendant breached its contract with the plaintiff by improperly refusing to award him a $1,000 scholarship.
*802 Violation Of General Business Law § 349
General Business Law § 349 prohibits misleading and deceptive business practices and applies to educational contracts (see, e.g., Brown v Hambric, supra, 168 Misc 2d, at 508-509; James v S.C.S. Bus. & Tech. Inst., NYLJ, Jan. 15, 1993, at 28, col 4; Matter of State of New York v Interstate Tractor Trailer Training, 66 Misc 2d 678 [1971]).
General Business Law § 349 is a broad, remedial statute (see, e.g., Oswego Laborers’ Local 214 Pension Fund v Marine Midland Bank, 85 NY2d 20 [1995]; see also, Note, New York Creates A Private Right Of Action To Combat Consumer Fraud: Caveat Venditor, 48 Brook L Rev 509 [1982]) directed towards giving consumers a powerful remedy. The elements of a violation of General Business Law § 349 are (1) proof that the practice was deceptive or misleading in a material respect, and (2) proof that the plaintiff was injured (see, Givens, Practice Commentaries, McKinney’s Cons Laws of NY, General Business Law § 349, at 565; Givens, Supp Practice Commentaries, General Business Law art 22-A, 1997 Pocket Part, at 169; McDonald v North Shore Yacht Sales, 134 Misc 2d 910 [1987]; Geismar v Abraham & Straus, 109 Misc 2d 495 [1981]). There is no requirement under General Business Law § 349 that plaintiff prove that defendant’s practices or acts were intentional, fraudulent or even reckless. Nor does plaintiff have to prove reliance upon defendant’s deceptive practices.
Defendant’s scholarship program and the grounds for denying plaintiff his $1,000 scholarship were misleading and deceptive in several respects. First, the two documents (Scholarship Plan and Agreement) which described the scholarship program were ambiguous, contradictory and misleading. As discussed above, employees who worked 50 weeks were as eligible for the $1,000 scholarship as were those who worked 56 weeks. Second, defendant’s refusal to award plaintiff a scholarship because he was issued the Probationary Report was deceptive. The Probationary Report was designed to help plaintiff perform better not to punish him by making him ineligible for the scholarship. Third, the Probationary Report itself contained false and misleading statements about how many hours plaintiff worked each week. Instead of less than 20 hours per week plaintiff had worked more than 25 hours per week.
Defendant has violated General Business Law § 349 and is liable to the plaintiff for all damages permitted thereunder.
*803 DAMAGES
The plaintiff is awarded the following damages: First, damages will include the $1,000 scholarship to be given by defendant to an accredited educational institution of the plaintiffs choice (UCCA 1804, 1805; see, Mongelli v Cabral, 166 Misc 2d 240, 243-244 [1995]) and costs of $10 to be paid to the plaintiff; second, the court finds that defendant has violated General Business Law § 349. Pursuant to General Business Law § 349 (h) the court finds that defendant has wilfully violated General Business Law § 349. Although the court would like to treble plaintiffs actual damages, the maximum permissible increase cannot exceed a total recovery of $1,000 (see, Hart v Moore, 155 Misc 2d 203 [1992]).

 The language in the Probationary Report was conciliatory and helpful. "The purpose of the probationary period is to establish a joint effort to help you meet acceptable standards. While failure to meet standards will result in dismissal, it is to everyone’s benefit if you can succeed. I will be glad to provide any additional coaching and training you need.”