The plaintiffs, Donna Craig, Dan McDonald, Karen Scott, and Lucile Bodenheimer (sometimes collectively referred to as "the students"), appeal from a summary judgment entered in favor of the defendant, Forest Institute of Professional Psychology. Our supreme court transferred the appeal to this court pursuant to § 12-2-7(6), Ala. Code 1975. We reverse and remand.
Forest is a college that specializes in psychology. It offers only two degrees, a master's degree and a doctorate in psychology. At all times pertinent to this case, Forest's main campus was in Wheeling, Illinois, and it operated satellite campuses in Springfield, Missouri, and Kaneohe, Hawaii. The main campus opened in 1979; the Missouri and Hawaii campuses were started in 1985 and 1987, respectively. In 1989, Forest established a third satellite campus in Huntsville, after acquiring the facilities of the American Institute of Psychotherapy (the Institute). The Forest system was accredited by the North Central Association Commission on Institutions of Higher Education (NCA). Forest's program in Huntsville was accredited by NCA from its inception because it was located at a satellite campus of an NCA-accredited institution. Forest also was pursuing accreditation from the American Psychological Association (APA). The Institute's program in Huntsville, however, was not and never had been accredited by the APA or any other accrediting association.
According to the rules of the Alabama Board of Examiners in Psychology, graduates of schools not accredited by any accrediting association are not allowed to sit for the Alabama licensure examination; therefore, *Page 970 
graduates of the Institute were not able to be licensed in Alabama. On the other hand, the Alabama Board of Examiners' rules did allow graduates of schools that were not accredited by the APA, but that were otherwise accredited, to sit for the licensure examination if they had obtained at least three academic years of study at a program accredited by the Alabama Council on Post-Secondary Accreditation. According to testimony presented by the students, Forest based the viability of its operation of the Huntsville campus on the assumption that former Institute students could be licensed if they graduated from Forest. The students say that Forest planned to depend on receiving tuition from such former Institute students until it could recruit a sufficient number of new students for the Huntsville campus to make it financially sufficient. Forest allowed such Institute students to transfer their credits to Forest on the theory that because those students obtained their degrees from an accredited institution, the Alabama Board of Examiners would allow them to take the licensure examination in Alabama. In so doing, Forest disregarded its own transfer policy, which stated that transfer credit was available only to students who had completed equivalent graduate course work at a regionally accredited institution.
The Alabama Board of Examiners, however, refused to allow the former Institute students to be licensed. Forest challenged that decision, but in Sandy v. Alabama Bd. of Examiners inPsychology, 632 So.2d 497 (Ala.Civ.App. 1993), this court affirmed the Alabama Board of Examiners' decision to require three years of study in an accredited program, not merely three years of study in any program coupled with a degree from an accredited institution. Forest's inability to obtain licensing for its former Institute students caused it to have fewer students initially than it had anticipated, and the low number of students caused a corresponding drop in tuition revenue at the Huntsville campus. Despite the ongoing dispute with the Alabama Board of Examiners over licensure requirements, Forest proceeded to actively recruit new students for the Huntsville campus, representing in its literature that its degree program in Huntsville was "designed to meet all the requirements of the Alabama Board of Examiners in Psychology, and thus potential graduates should be eligible for licensure." Indeed, nothing in the record indicates that the Alabama Board of Examiners would have refused to allow an opportunity to be licensed to students who took their entire course work from Forest.
In 1989, Craig recently had received her bachelor's degree and wanted to continue her education to obtain a doctorate in psychology. After talking with one of the Forest faculty members about the school, she contacted the Huntsville campus administration. Craig began her studies at Forest in September 1989. McDonald was employed as a program director at a youth facility in Louisiana. He sought a doctoral degree program offering a practice-oriented degree that would not require him to move too far away from Louisiana; he found what he was seeking at Forest. McDonald moved to Alabama and enrolled at Forest in January 1991. Scott already had a master's degree in psychology and was employed full-time in Huntsville as a licensed professional counselor. Her husband also was employed full-time in Huntsville, and her child attended school there. Forest's program appealed to Scott because while participating in it she could keep her job and would not have to move her family in order to obtain her doctorate. Scott says that the dean of Forest's Huntsville campus told her: "You are the exact type of student the Huntsville campus is seeking; an individual professionally engaged in practice [who] wants to seek a terminal degree." She began classes at Forest in September 1991. Bodenheimer was a licensed professional counselor in Anniston and had been in private practice since 1983. She found the Forest program attractive because it would allow her to obtain her doctorate without discontinuing her practice. Bodenheimer enrolled at Forest in September 1990.
Each student testified that Forest faculty and administrative staff members represented to him or her that students at the Huntsville campus who completed Forest's required course of study would be able to obtain the degree they sought and would be *Page 971 
eligible for licensure in Alabama. The doctoral program at Forest required a minimum of four years to complete. All four students testified that they would not have enrolled at Forest unless they had been assured that they would be eligible for licensure. Scott and Bodenheimer specifically sought the ability to obtain a license in Alabama.
Forest's program of study included a provision that required continuous registration of its students until they graduated. That provision, contained in its student handbook, stated:
 "Once enrolled, students are expected to register every term thereafter until completing the M.A. or Psy.D. degree. If a student is not enrolled for any credit hours, he/she may satisfy this requirement by registering for 'Continuous Registration — Zero Credits.' An example of this case would be a student who is working on completion of the clinical dissertation requirement who has already completed the required number of credit hours."
Literature provided by Forest to its student body included not only its handbook, but several other informational publications as well. Some of those publications were brochures describing student life, tuition and financial aid, programs and courses, and policies and regulations, as well as a flyer entitled "Introducing Our New Campus in Huntsville, Alabama." Another publication, entitled "A View," described the Forest system and its various campuses, stated the mission of the institution, and provided information about the faculty, administration, and trustees. Two editions of "A View" are contained in the record. The first includes information about the Illinois, Missouri, and Hawaii campuses only. The second, obviously a later edition, includes information about the Huntsville campus as well. Beneath the table of contents in both editions, the following statement appears in relatively small type:
 "While every effort is made to ensure the accuracy of the information at the time copy is prepared for this publication, Forest Institute reserves the right to make changes without prior notice and to apply such changes to new and current students alike. Unless the revision fundamentally alters the nature of the work required for the student, either quantitatively or qualitatively, it will go into effect immediately."
"A View" is the only Forest publication in which this statement appears.
In the spring of 1992, NCA placed Forest on academic probation, an action that jeopardized Forest's NCA accreditation. According to Forest's president, Dr. Richard Cox, NCA's main concern was what it considered a lack of adequate financial resources at the Huntsville campus, but he said that NCA also had concerns about Forest's Hawaii campus. According to the record, NCA also was concerned about the low enrollment of minority students and the faculty-to-student ratio. The record also contains testimony indicating that the entire Forest system was experiencing financial difficulties. Forest's administration sought to address the institution's financial problems by trying to find other institutions that could assume the programs offered at some of its satellite campuses, seeking grant funds, and attempting to increase the student base. Those efforts were unsuccessful in Huntsville, however, and when Forest's board of trustees met in December 1992, it voted to close the Huntsville campus. Dr. Cox was instructed to develop a plan for the closing.
Dr. Cox met with the student body at the Huntsville campus in December 1992, and at that meeting announced that the Huntsville campus would be closing. The students say that Cox represented to them that Forest would implement a "teach-out" plan to allow all members of the student body then enrolled in Huntsville to complete their degrees. Based on those representations, the students say, they registered and paid tuition for the winter semester. Dr. Cox testified, however, that he informed the student body that Forest would attempt to develop a plan for each of them "as best we could" to allow them to complete their work. He also stated that Forest was trying to make certain at that time that it fulfilled its "immediate contract, which was to complete the courses for which the [student body] had enrolled and paid tuition." All students at the Huntsville campus later were notified by a letter dated *Page 972 
March 9, 1993, that the campus would close on June 30, 1993. Craig and McDonald attended classes during the spring semester, but Scott and Bodenheimer left the program after completing the winter semester. Forest officials say that, assisted by the Alabama Commission on Higher Education, they attempted to minimize the negative effect on the student body by keeping the Huntsville campus open as long as possible, offering transfers to Forest's other campuses, and trying to find institutions to which Forest students could transfer.
Upon notification that the Huntsville campus would close in June 1993, the students attempted to find other alternatives to allow them to complete their degrees. Craig attempted to transfer the credit hours she had earned at Forest to other institutions, but she says that none of the institutions to which she applied would accept any of her credits from Forest. McDonald transferred to Tennessee State University, but he says he lost all of the credits he earned at Forest and essentially started over. Because Scott's job and family were established in Huntsville, she says that she was not in a position to transfer to any of the other Forest campuses or to another institution. Bodenheimer transferred to the Georgia School of Professional Psychology in Atlanta, but she says she lost 42 credit hours and suffered a year's delay in obtaining her doctorate.
Craig sued Forest, and McDonald, Scott, and Bodenheimer intervened in the case. The students alleged fraud, breach of contract, suppression of material facts, unjust enrichment, and fraudulent inducement. Forest moved for a summary judgment, which was opposed by the students. All parties supported their positions with briefs and by submitting evidence. The trial court entered a summary judgment in favor of Forest. All four students then appealed.
The students argue that they presented substantial evidence as to their breach of contract and fraud claims and thereby precluded the entry of a summary judgment against them. They also argue that they did not yet have the burden to present evidence as to their suppression, unjust enrichment, and fraudulent inducement claims.
Our standard for reviewing a summary judgment is well settled. The summary judgment was proper if there was no genuine issue of material fact and Forest was entitled to a judgment as a matter of law. Rule 56, Ala. R. Civ. P. Forest had the burden to make a prima facie showing that no genuine issue of material fact existed and that it was entitled to a judgment as a matter of law. Long v. Jefferson County,623 So.2d 1130 (Ala. 1993). If Forest made that showing, then the burden shifted to the students to present evidence creating a genuine issue of material fact, so as to avoid the entry of a judgment against them. Id. In deciding whether there was a genuine issue of material fact, we view the evidence in the light most favorable to the nonmovant and resolve all reasonable doubts against the movant. Id. The applicable standard of review is the "substantial evidence" rule. §12-21-12, Ala. Code 1975. "Substantial evidence" is defined as "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. FoundersLife Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989).
We first address the students' breach of contract claim. The students contend that a material issue of fact exists regarding the terms of the contract between Forest and its student body. They argue that the contract resulted from many sources, only one of which was the publication called "A View," which contains the disclaimer language on which Forest relies. Despite that language, the students insist that Forest promised them that they could obtain a doctorate in psychology in Huntsville and a license to practice in Alabama. They rely heavily upon the continuous registration language in the student handbook. The students also contend that a material issue of fact exists regarding whether Forest breached the terms of its contract with them when it closed without allowing them to complete their degrees.
Forest contends that it fulfilled the terms of any contract it had with the students when it provided them with all courses for which they had enrolled and paid tuition, relying on *Page 973 
a South Dakota case in which a student sued a state university after it closed the particular campus where he was enrolled. See Aase v. State, 400 N.W.2d 269 (S.D. 1987) (the only contract formed between a student and the school he or she attends is for the term for which tuition is paid.) Forest argues that it could not have remained open in Huntsville in light of its unforeseen accreditation and financial problems, and that attempting to do so would have jeopardized the accreditation of all of its campuses. Forest relies heavily on the disclaimer language contained in "A View," insisting that it specifically reserved the right to make changes in its programs.
In an action alleging breach of contract, a summary judgment is appropriate only when the contract is unambiguous and the facts are undisputed. Harrington v. Feld, 586 So.2d 220
(Ala.Civ.App. 1991). If a contract contains ambiguous terms, then the true meaning of the contract is a question for the finder of fact, and surrounding circumstances, including the construction placed by the parties on the contract language, may be taken into consideration in order to ascertain the intent of the parties. Akins v. Randolph County Bd. of Educ.,643 So.2d 995 (Ala.Civ.App. 1994). At this stage in these proceedings, the terms of the contract between the students and Forest are far from clear. There is no Alabama case directly on point, but the United States Court of Appeals for the Seventh Circuit has discussed the contractual relationship between a student and a private college as follows:
 "It is held generally in the United States that the 'basic legal relation between a student and a private university or college is contractual in nature. The catalogues, bulletins, circulars, and regulations of the institution made available to the matriculant become a part of the contract.' Zumbrun v. University of Southern California, 25 Cal.App.3d 1, 101 Cal.Rptr. 499, 504 (1972) (collecting cases from numerous states). Indeed, there seems to be 'no dissent' from this proposition. Wickstrom v. North Idaho College, 111 Idaho 450, 452, 725 P.2d 155, 157 (1986) (quoting Peretti v. Montana, 464 F. Supp. 784, 786
(D. Mont. 1979), rev'd on other grounds, 661 F.2d 756
(9th Cir. 1981)).
". . . .
 ". . . We also recognize a formal university-student contract is rarely employed and, consequently, 'the general nature and terms of the agreement are usually implied, with specific terms to be found in the university bulletin and other publications; custom and usages can also become specific terms by implication.' Wickstrom, 725 P.2d at 157 (quoting Peretti, 464 F. Supp. at 786)."
Ross v. Creighton Univ., 957 F.2d 410, 416-17 (7th Cir. 1992). See also Dixon v. Alabama State Bd. of Educ., 294 F.2d 150, 157
(5th Cir.), cert. denied, 368 U.S. 930, 82 S.Ct. 368,7 L.Ed.2d 193 (1961).
With deference to the distinguished South Dakota court, we note that this court is not bound by that court's decision relied on by Forest. Indeed, it is not clear that Forest fulfilled all of its contractual obligations to the students merely by providing them with instruction for which they had paid tuition on a semester-by-semester basis. Courts in other states have recognized breach of contract claims in cases where a private college or university breached a specified promise made to its students. See, e.g., Ross, 957 F.2d. at 417 (student stated a breach of contract claim against the university when he alleged that it had reneged on its commitment to provide specific services he needed to benefit from the school's academic programs in return for his playing basketball); Joyner v. Albert Merrill School, 97 Misc.2d 568,411 N.Y.S.2d 988 (N.Y. City Civ. Ct. 1978) (student was successful in a breach of contract claim against a college that had promised him a job upon the completion of his studies). Cf.Blane v. Alabama Commercial College, Inc., 585 So.2d 866
(Ala. 1991) (summary judgment was proper as to the student's breach of contract claim when there was no evidence that the college had made promises of employment).
Furthermore, we do not find the alleged disclaimer language in the publication "A View" to be dispositive. That language reasonably could be interpreted to apply only to the material found in that publication, *Page 974 
rather than to express a clear intention to reserve the right to modify or discontinue the programs offered by the institution. The contents of the many other publications furnished to the students also must be considered in determining the terms of this contract. The "continuous enrollment" language relied on by the students clearly required them to commit to enrollment in Forest's program until they completed their degree requirements. Did Forest have a corresponding obligation to provide the educational program necessary for the students to obtain their degrees? What were the terms of the contract between Forest and the students? Were oral representations made to the students a part of the contractual terms, and, if so, which representations? Obviously, this court cannot, and should not, answer those questions. The students clearly presented genuine issues of material fact relative to their breach of contract claim.
We now turn to the students' fraud claim. The students contend that they presented substantial evidence that the alleged representation that they would be able to obtain their degrees in Huntsville and be licensed in Alabama, which they say was made in Forest's written publications and was made orally to them by school officials, was a representation that Forest either knew or should have known was false. They argue that when Forest realized it could not depend upon tuition from the former Institute students because of the problems with their licensure by the Alabama Board of Examiners, Forest should have known that it faced problems with the Huntsville campus. Instead, the students argue, Forest continued to actively recruit new students, representing to them that they would be able to obtain their degrees at the Huntsville campus and failing to disclose to them the precarious financial position of the school.
Forest contends that it had every intention of operating its Huntsville campus on a long-term basis when it was established, and that, based on what it knew at the time, it did not misrepresent any facts to the students. Forest also argues that because it did not know that the Alabama Board of Examiners would refuse to allow the former Institute students to be licensed, there is no evidence that it did not intend to keep its promises at the time that the Huntsville campus was established.
"Legal fraud" is defined in § 6-5-101, Ala. Code 1975:
 "Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud."
To prevail on a fraud claim, a party must prove (1) that there was a false representation; (2) that the false representation concerned a material existing fact; (3) that the party relied upon the false representation; and (4) that the party was damaged as a proximate result of relying on the false representation. Cowen v. M.S. Enterprises, Inc., 642 So.2d 453
(Ala. 1994). After reviewing all of the evidence presented by the students, we conclude that they presented a genuine issue of material fact as to whether Forest represented to them that they could obtain and complete their education in Huntsville.
The students testified about representations they say were made to them at the time they were recruited to enroll at Forest. Whether Forest officials made the representations the students say they relied on is disputed, as is the content of the representations and when they allegedly were made. In addition, the students supplied a videotape of the meeting they had with Dr. Cox in December 1992 in which, they argue, he "repeatedly" said they would be able to complete their education in Huntsville. In his deposition, Dr. Cox testified that he did not recall telling the student body that the Huntsville campus would remain open so that they could complete their training. He also testified that he did not recall discussing with NCA officials or the Forest student body a two-year period for the proposed teach-out, and he said that he didn't know "how that could have been financially even considered." The videotape shows, however, that at the meeting, Dr. Cox assured the student body that every student in the program was "going to graduate if they [made] their grades" and at least implied that those who wanted to *Page 975 
complete their education in Huntsville, especially second- and third-year students, would be able to do so. For example, Dr. Cox stated at the meeting: "I see no possibility for students who are currently enrolled in any way being jeopardized." He also discussed Forest's expectation that it would be able to keep the Huntsville campus open for two years to complete the proposed teach-out, and stated to the students that Forest anticipated that NCA officials would allow a teach-out of two years' duration. The representations made by Dr. Cox and other Forest officials ultimately proved to be false. Under Alabama law, even a misrepresentation "made by mistake and innocently and acted on by the opposite party" still may constitute "legal fraud." See § 6-5-101.
Forest insists that any fraud in this case would have been promissory fraud, and that an essential element in a claim for fraud predicated on a promise to perform in the future is that the misrepresentation must have been made with an intent to deceive. Phillips Colleges of Alabama, Inc. v. Lester,622 So.2d 308 (Ala. 1993); Hodges v. Pittman, 530 So.2d 817
(Ala. 1988). The mere failure to perform is not evidence, in and of itself, that when the representation was made the promisor intended not to perform, for if it were, then the mere breach of a contract would be tantamount to fraud. Id. Ordinarily, the question of the promisor's intent is a matter peculiarly within the province of the finder of fact, but a jury is not allowed unbridled discretion to speculate upon the existence of that intent. Hodges, 530 So.2d at 819. The plaintiff must present evidence that there was something more than a failure to perform — something from which a jury could infer that when the promise was made the promisor had no intention of performing. Id.
Forest points to testimony from Dr. Edwin Wagner, dean of the Huntsville campus, that Forest officials thought that the Huntsville location had "tremendous potential" and that Forest had signed either a 30- or a 50-year lease for the use of the facilities acquired from the Institute. Dr. Wagner also testified, however, that school officials told him that the Huntsville campus needed approximately 75 students to make a profit, and that the Board of Trustees knew as early as 1990 that Forest would lose 30 to 40 of the initial students at the Huntsville campus if former Institute students were not allowed to sit for the licensure examination in Alabama. Furthermore, Dr. Wagner testified that Forest never assured itself, before it established the Huntsville campus, that former Institute students would be able to be licensed. He stated that he was informed that "this was a standard procedure and that there would be no difficulty with the Alabama licensing board."
Forest argues that it was forced to close the Huntsville campus because of serious and unforeseen financial problems. But, is it clear under the record that those problems were unforeseen? The licensing problems with the former Institute students began immediately after Forest opened the Huntsville campus, and Forest's decision to challenge the Alabama Board of Examiners' decision did not guarantee that it would prevail. Ultimately, it did not, and predictable financial difficulties followed. Dr. Wagner testified that although he and other staff members at the Huntsville campus were keeping their "heads above water, there was no way that you could turn a decent profit until we graduated our first students. . . . So that was the critical question, whether we could stay afloat until then." Under the facts posed, we conclude that there is a genuine issue of material fact as to whether Forest, at the time it made promises to the students, intended to deceive them. See Phillips Colleges, 622 So.2d at 311-12 (affirming a judgment based on a jury verdict for a student who presented sufficient evidence to create a question of fact for the jury about whether, at the time the school contracted with him, it did not intend to provide him with the training outlined in its materials).
Finally, the students contend that the trial court had before it no evidence in support of Forest's motion for a summary judgment as to their suppression, unjust enrichment, and fraudulent inducement claims. Forest supported its summary judgment motion as to those claims only by two affidavits, one from Dr. Cox and one from a member of *Page 976 
Forest's board of trustees, and a general statement that the motion was supported by other evidence in the record. The trial court struck those two affidavits, however, so they should not have been considered by the trial court when it made its decision, nor will we consider them. The party moving for a summary judgment has the burden to demonstrate that no genuine issue of material fact is left for the finder of fact.Schoen v. Gulledge, 481 So.2d 1094 (Ala. 1985). Until the movant does so, there is no burden on the opposing party to establish a genuine issue of material fact. Id. Forest has not met its burden as to the students' claims of suppression of material facts, unjust enrichment, and fraudulent inducement, and, therefore, the summary judgment was not proper as to those claims. Alas, those claims hardly have been developed by the parties.
In conclusion, there are far too many unresolved factual issues for a summary judgment to be appropriate at this time. The summary judgment procedure is not a substitute for a trial on disputed issues of fact, and it cannot be used to deprive a litigant of a proper trial in which to resolve genuine issues of material fact. Duckett v. Wilson Hotel Management Co.,669 So.2d 977 (Ala.Civ.App. 1995). The summary judgment, therefore, is hereby reversed, and the cause is remanded for further proceedings.
The foregoing opinion was prepared by Sam A. Beatty, Retired Justice, Supreme Court of Alabama, while serving on active duty status as a judge of this court under the provisions of §12-18-10(e), Ala. Code 1975.
REVERSED AND REMANDED.
All the judges concur.